In re Michael R. DURBIN and Louise M. Durbin, Debtors.

SHELBINA MERCANTILE BANK, a Banking Corporation of the State of Missouri, Plaintiff,

v.

Michael R. DURBIN and Louise M. Durbin, Defendants.

Bankruptcy No. 85–00048(N). Adv. No. 85–0016(N).

United States Bankruptcy Court, E.D. Missouri, N.D.

Feb. 7, 1986.

---

Fredrich J. Cruse, Hannibal, Mo., Trustee.

Clifford H. Ahrens, Hannibal, Mo., for plaintiff.

Austin Parham, Hannibal, Mo., for debtors/defendants.

## MEMORANDUM OPINION

JAMES J. BARTA, Bankruptcy Judge.

The matter being considered here is the adversary complaint of the Shelbina Mercantile Bank to determine the dischargeability of certain debts owed by Michael R. and Louis M. Durbin. The parties appeared in person and by counsel at the trial on January 13, 1986, and presented testimony, evidence, and oral argument upon the record. The trial was concluded on the same date and the matter submitted to the Court on the record as a whole.

The Plaintiff has requested non-dischargeability of a debt for willful and malicious conversion of the bank's property pursuant to 11 U.S.C. § 523(a)(6). The Plaintiff has also requested a money judgment in the amount of $54,545.38, which represents the outstanding balance on two notes owed by the Debtors to this Plaintiff.

The Defendants are husband and wife who operated a business known as Missouri Confinement Supply which bought and sold livestock equipment and supplies. The business had been operated from about 1978 through the date of filing of the Voluntary Chapter 7 Bankruptcy Case, February 27, 1985. The record contains no information concerning incorporation of the business; and the Debtors testified that their business operations were reported on their individual income tax returns. Therefore, the Court concludes that for purposes of this bankruptcy proceeding, the Debtors were doing business under the name of Missouri Confinement Supply, and under the various other business names as are described herein.

The Missouri Confinement Supply began to experience difficulties in about 1983. The Debtors then began a business known as Deli-Cade in Shelbina, Missouri. This business was later expanded and became known as Durbin's Pizza and Grill. A sec-

ond Durbin's Pizza and Grill was subsequently opened in Shelbyville, Missouri. In May, 1984, the Debtors began selling satellite television equipment through a company known as Missouri Satellite. The Debtors testified that generally a new business had been begun when an existing business began to experience difficulties. For a period of time preceding the filing of this Bankruptcy case, the Debtors were also working in salaried occupations, which were not associated with their business ventures.

The transactions which are the subject of this proceeding began on about February 29, 1984. At that time, the Debtors negotiated two notes with the Plaintiff bank. One note refinanced several earlier notes which had been executed in connection with the Missouri Confinement Supply. The second note was in part a re-financing of previous Missouri Confinement Supply notes and, in part, a loan of new money for the operation of Durbin's Pizza and Grill.

Although the evidence at the trial described numerous business activities conducted by the Debtors, the Court has determined that three transactions involving the sale of bank collateral may be a basis for a determination of non-dischargeability. The Defendants' other actions as described in this trial are being considered here as evidence in support of or in refutation of the allegations of willful and malicious conduct. Although these three sales are being considered separately, the final determination in each instance is based upon a consideration of all of the Debtors' dealings with the Plaintiff bank, and a consideration of the record as a whole.

### THE OVERFELT SALE

In August, 1984, the Debtors sold the bulk of the restaurant equipment from the Shelbyville location of their Bar and Grill to Mark Overfelt in a private sale. Although the Debtors' answers to interrogatories indicate that the purchase price was $7,000.00, upon examination of certain bank documents at trial, the Debtors testified that the actual sale price was $8,000.00. On August 25, 1984, the Debtors used $6,000.00 of these sale proceeds and $200.00 in cash from other sources to obtain a $6,200.00 Cashier's Check from the Plaintiff Bank (Plaintiff's Exhibit 17). The Debtors testified that the balance of the proceeds of the sale ($2,000.00) was used in the following manner: $1,000.00 paid to the Internal Revenue Service, and $1,000.00 for living expenses and expenses in connection with Durbin's Bar and Grill.

The Debtors held the $6,200.00 check and other cash in a safe in their home until about September 4, 1984. On September 4, 1984, the Debtors endorsed and cashed the cashier's check, receiving $6,200.00 in cash from the Plaintiff Bank. On the same date, the Debtors stated that a portion of these proceeds in the amount of $3,870.00 was deposited into the account of the Missouri Confinement Supply Company. On September 14, 1984, the Debtors made a second cash deposit in the amount of $2,130.00. The Debtors stated that these two deposits, totaling $6,000.00, were part of the $8,000.00 which were proceeds from the Overfelt Sale. None of these monies, however, were directly traced to payments to the Bank to reduce the Debtors' obligations.

### THE SHELBINA AUCTION SALE

In early September, 1984, Mr. Durbin contacted the Bank concerning a sale of equipment from the Shelbina Bar and Grill. With the Bank's permission, the property was sold at auction. On September 18, 1984, the Debtor testified that he deposited $3,954.16 as the proceeds of the auction sale into the Missouri Confinement Supply account. On the same date, he paid $2,350.91 to the Bank to be credited against the outstanding notes. The Bank's ledgers indicate that two additional amounts were paid on September 18, 1984 as follows: $173.02 toward principal and $206.74 toward interest on other notes held by the Bank.

The difference between the amount deposited and the total amount of the payments was then co-mingled with other mo-

nies in the account and used to pay various other expenses, including an additional payment of $380.00 on October 15, 1984 to the Bank.

### SATELLITE EQUIPMENT SALE

In mid-October, 1984, the Debtors sold the remaining items of satellite equipment to a private individual for the amount of $1,700.00. The Bank's records reflect that a deposit was made to the Missouri Confinement Supply account in the amount of $1,700.00 on November 2, 1984. On the same date, the Debtors made payments to the Bank in the amount of $1,420.98 which were credited against delinquent and current payments on their notes. Again, the difference between the amount deposited and the amount paid to the Bank was comingled in the Debtors' account and used to pay various other debts and expenses.

Other than the payments described above, the Debtors made no further payments on their notes to the Bank during the period between September, 1984 and the date of filing their joint Chapter 7 Bankruptcy petition, February 27, 1985.

The Bank's witness testified that although the Bank had knowledge of and had generally agreed to the various sales of collateral described by the Debtors, at no time did the Bank authorize the use of sale proceeds for purposes other than to reduce the Bank debt. The witness agreed, however, that prior to September, 1984, the Bank had not objected to the sale of collateral and the use of proceeds for business operations and living expenses. The Bank witness testified further that after the Overfelt sale, he had contacted Mr. Durbin concerning the application of sale proceeds. He stated that he was advised that Mr. Durbin intended to use some of these monies to purchase additional items for the satellite business. The Bank witness stated that he did not give Mr. Durbin authorization to use the proceeds in this manner and suggested that the proceeds should be applied to the Debtors' loans. During cross-examination, the Bank's witness stated that in fact the Bank had provided 100 percent financing to Mr. Overfelt to purchase the Bank collateral from these Debtors.

During both direct testimony and cross-examination, the Debtors testified that they did not pay the entire proceeds of these various sales to the Bank because they had been advised that it was only necessary to keep the payments current on the various notes, leaving the remaining monies available for continued business operations. Although the Debtors believed that in fact their notes had been current during the period immediately prior to bankruptcy, the Bank records indicate that several payments on the various notes were in fact made after the agreed-to payment dates. The Debtors testified further that in addition to the Overfelt sale proceeds, certain other cash amounts representing daily receipts from their business operations were also periodically kept in the safe in their home. Generally, the monies remained in the safe for no longer than two weeks. The Debtors' testimony and the Bank's testimony concerning the Debtors' motivation for holding the cash money in the Debtor's home were inconsistent. The Debtor testified that the Bank officer had instructed him to remove monies from his account at the Bank so as to prevent a levy and seizure by the Internal Revenue Service. The Debtors would then re-deposit monies as the Bank would advise them that funds were needed to prevent an overdraft. The Bank's officer acknowledged a discussion with the Debtor concerning monies owed for taxes to the Internal Revenue Service, but denied having made any suggestion concerning withdrawals to avoid a levy and seizure.

### DISCHARGEABILITY

■ A debt may not be discharged in a Bankruptcy proceeding if it is for willful and malicious injury by the debtor to another entity or to the property of another entity, pursuant to 11 U.S.C. § 523(a)(6). A breach of a security agreement involving the sale of collateral out of trust may be a basis for a determination of non-discharge-

ability as a willful and malicious injury to the property of another. See *In re Kimzey*, 761 F.2d 421 (7th Cir., 1985).

The Eighth Circuit Court of Appeals has recently discussed the development of the concept of willful and malicious injury both before and after enactment of the Bankruptcy Code. After noting a divergence of opinion with regard to the applicability of the "reckless disregard" standard, the Court stated that:

> .... we believe non-dischargeability turns on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain to cause financial harm. *In re Long*, 774 F2d 875, 881 (8th Cir., 1985).

Although the Plaintiff in this case has alleged that the Debtors converted the property which was collateral for its loans, the evidence clearly showed that the sales were either with the Plaintiff's consent, or made in the course of the Debtors' business according to established practices between the parties. The more difficult questions are presented by the manner in which the Debtors handled the cash proceeds of the various sales. There can be little doubt that the Debtors acted willfully in the somewhat confusing machinations which resulted in various amounts of cash being stored in the safe at their home. It is clear, however, that from the total proceeds of the Overfelt sale and the restaurant equipment sale ($11,601.06) the Debtors used the sum of $7,069.41 to pay the Internal Revenue Service, to purchase other business equipment, and to pay certain living expenses. Although such practices are contrary to the terms of most security agreements, the record here does not establish that the Debtors' conduct was targeted at this Plaintiff, or that it was almost certain to cause financial harm. To the contrary, the evidence strongly suggests that the Debtors and the Bank reasonably anticipated that the application of some of the sale proceeds to the Debtors' other business ventures would result in on-going payments on the Bank debt.

The facts and circumstances surrounding the Shelbina Auction Sale and the Satellite Equipment Sale support the conclusion that the Debtors' conduct overall was not malicious. The manner in which the Debtors handled transactions through their bank account creates an air of suspicion as to their motives in their dealings with all their creditors. However, this conduct does not rise to that level of malice required by Section 523(a)(6). Therefore, by separate order, the Plaintiff's complaint is denied.