In re Jerrel Wayne KRAFT and Deborah Ann Kraft, Debtors.

PRINCESS HOUSE, INC., n/k/a Former PHI, Inc., Plaintiff,

v.

Deborah Ann KRAFT, Defendant.

Bankruptcy No. 95–40362.
Adv. No. 95–4121.

United States Bankruptcy Court,
W.D. Missouri.

June 27, 1996.

Timothy J. Sear, Polsinelli, White, Varde-man & Shalton, P.C., Overland Park, KS, for Plaintiff.

David D. Ferguson, McDowell, Rice & Smith, P.C., Kansas City, MO, for Defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Plaintiff Princess House, Inc. ("plaintiff" or "Princess House") brought an adversary proceeding in debtors' Chapter 11 bankruptcy case claiming a judgment obtained by plaintiff against debtor/defendant Deborah Kraft ("debtor") in the United States District Court–Western District of Missouri (the "District Court") on November 4, 1994, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, and as announced at the hearing held on June 13, 1996, I find that the judgment debt is dischargeable.

## FACTUAL BACKGROUND

The jury in the District Court found that debtor and her parents tortiously interfered with contracts between Princess House and others, and misappropriated and/or wrongfully used plaintiff's trade secrets.

Plaintiff makes home decoration products including lead crystal. It recruits "consultants" to sell Princess House products at in-home parties. Debtor began working for

Princess House as a consultant in 1972, having been recruited by her mother Rita Lindsey. Over the years, debtor became an "organizer," which means she recruited other people to sell Princess House products at in-home parties. Eventually, debtor's recruits also recruited consultants. As a result, debtor received a sales commission called an "overwrite" on all products sold "downline" in her sales zone. Debtor became very successful as an organizer for plaintiff, earning approximately $91,000.00 in 1983. Debtor claims, however, that in the mid-1980's plaintiff's product became harder to sell, and that the product which was sold was back ordered for long periods of time. For a variety of reasons, plaintiff was unable to deliver product to purchasers in time for the 1989 Christmas season. This caused debtor's customers to demand the return of their deposit money, and everyone in the sales chain lost commissions.[1] Debtor's income decreased to approximately $66,000.00 for 1989. Debtor, therefore, decided in early 1990 to add another product line, called Jewels by Park Lane ("Park Lane"), to supplement her decreased income.

Debtor had signed an agreement with Princess House in 1986 which did not prohibit her from selling products of other direct sales organizations. In 1989, however, Princess House developed a new agreement which prohibited the sale of any other product. All new recruits signed this agreement. All other consultants and organizers were asked to voluntarily sign the new agreement. Ms. Kraft and her parents chose not to sign the new agreement, since they were not required to do so. The signed agreements were returned directly to Princess House, therefore, debtor testified that she did not know which, if any, of her downline sales force signed the 1989 Agreement.

After deciding to sell Jewels by Park Lane, debtor stated she contacted approximately eight people in her Princess House sales organization and advised them that she was adding Park Lane products. She pointed out to them that Park Lane paid a higher commission than Princess House and that the products were easier to sell. Debtor testified that she worked closely with these organizers, and that she didn't want them to hear from someone else that she had added Park Lane. The District Court Jury found these contacts to be tortious interference with contract. Debtor argues in this Court that such contacts were made as part of her effort to replace the income she was losing, and not because of any malice toward plaintiff.

The 1986 Agreement prohibited debtor from using any proprietary information "provided by Princess House for the duration of the Agreement and thereafter." Pl.Ex. # 11, ¶ 17. The jury found that debtor violated the 1986 Agreement, and misappropriated trade secrets, by utilizing the names of her downline sales force for the benefit of Park Lane. Debtor maintains that such information was generated by her, and not provided to her by Princess House. Once again, debtor contends in this Court that any violation of the 1986 Agreement was motivated by her desire to supplement her reduced income, and not by any malice toward plaintiff.

The jury in the District Court Case awarded actual damages against debtor in the amount of $357,087.00 for tortious interference with contract, and $439,817.00 for misappropriating trade secrets. The jury chose not to award punitive damages on either theory of liability.

Plaintiff asked this Court to give collateral estoppel effect to the District Court judgment and to grant its motion for summary judgment. Following a hearing on plaintiff's motion for summary judgment on January 8, 1996, this Court denied plaintiff's motion, holding that there was a genuine issue of material fact as to whether debtor acted with

---

1. Debtor testified that the supply problems in 1989 made it very difficult to obtain recruits or to book in-house parties, as customers became very angry when they did not receive their purchases in time for Christmas in 1989. Both Judy Kohlberg and Dixie Ross, organizers who worked in Rita Lindsey's zone, also testified that the supply problems in 1989 almost destroyed their business. Ms. Ross, for example, stated that the sales for her group decreased from $380,000.00 in 1989 to $70,000.00 in 1990. Both witnesses testified that Princess House's inability to supply product in 1989 had a major impact on their income.

malice.[2] There is no dispute that the jury award as to tortious interference is tantamount to a finding of willfulness. These debts, however, can only be excepted from discharge if debtor acted both willfully and maliciously. Accordingly, this Court held a hearing limited solely to the issue of whether debtor acted maliciously. At the close of such hearing, I found that plaintiff had not met its burden of proving that debtor acted with malice.

## DISCUSSION

 One of the primary purposes of bankruptcy law is to give an honest debtor "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debts." *Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971). Therefore, exceptions to discharge are strictly construed and the evidence must be viewed in the light most favorable to debtor. *Barclays American/Business Credit, Inc. (In re Long),* 774 F.2d 875, 879 (8th Cir.1986). The burden of proof is on the creditor to prove each element of a particular section 523(a) discharge exception by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

There is no specific provision of the Bankruptcy Code (the "Code") which provides that debts arising from tortious interference with contractual relationships or misappropriation of trade secrets are nondischargeable. *See* 11 U.S.C. § 523(a). Plaintiff, however, filed this adversary complaint under section 523(a)(6) of the Code. Section 523(a)(6) of the Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6).[3] Although the jury found that debtor acted willfully, there was no specific finding that her actions were malicious.[4] The narrow issue then in this Court is a determination whether debtor acted with malice within the meaning of Bankruptcy Code Section 523(a)(6).

 The Eighth Circuit holds that section 523(a)(6) is directed "at the nature of the conduct which gives rise to the debt, rather than the nature of the debt." *Johnson v. Miera (In re Miera),* 926 F.2d 741, 745 (8th Cir.1991); *See* 3 **Collier on Bankruptcy** ¶ 523.16[1] (Lawrence P. King et al. eds. 15th ed. 1996). The Eighth Circuit also holds that conduct is malicious if it is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. *Barclays American/Business Credit, Inc. (In re Long),* 774 F.2d 875, 879 (8th Cir.1985) (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332–33, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934)).

Plaintiff presented its case based primarily upon the testimony of Deborah Kraft and her mother, Rita Lindsey, along with the jury instructions used in the District Court Case. No one from Princess House testified.

 The verdict-directing instruction for tortious interference required the jury to find "[t]hat the defendant caused the breach or ending of the relationship *intentionally* and *without justification or excuse.* Pl.Ex.

---

**2.** For the same reason, I also denied debtor's motion for summary judgment.

**3.** I note that in *Perez* the Supreme Court stated that Congress intended the bankruptcy discharge "to include freedom from most kinds of pre-existing tort judgments." 402 U.S. at 648, 91 S.Ct. at 1711. Even though *Perez* was decided prior to the enactment of the Bankruptcy Code, section 17 of the Bankruptcy Act contained a provision comparable to section 523(a)(6), excepting willful and malicious injuries from discharge. 11 U.S.C. § 35a(8) (repealed 1978).

**4.** In Instruction No. 26 the jury was instructed that it had discretion to award punitive damages if it found debtor's conduct to be "outrageous because of her evil motive or because of her reckless indifference to the rights of others." Pl.Ex. # 13, pg. 31. The jury did not award punitive damages. Pl.Ex. # 14. Since the award of punitive damages was discretionary, no conclusion can be drawn from the jury's failure to award such damages.

# 13, at pg. 28 (emphasis added). Plaintiff argues that this element of tortious interference requires the equivalent of a finding that debtor's conduct was malicious. I agree that a definition of malice in law is "a wrongful act done intentionally without justification or excuse." *Lyons v. St. Joseph Belt Ry. Co.,* 232 Mo.App. 575, 84 S.W.2d 933, 944 (Mo.Ct. App.1935). *See also Central Bank of Lake of Ozarks v. Shackleford,* 896 S.W.2d 948, 954 (Mo.Ct.App.1995) (quoting *Downey v. United Weatherproofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976, 980 (1953)). Missouri Courts, however, have long recognized three degrees of malice: "(1) actual malice which means ill will, spite, personal hatred, or vindictive motives; (2) legal malice which embraces any improper motive; and (3) malice in law, which is defined as a wrongful act done intentionally without justification or excuse." *Proctor v. Stevens Employment Services, Inc.,* 712 S.W.2d 684, 686 (Mo.1986) (en banc) (quoting *Sanders v. Daniel Int'l Corp.,* 682 S.W.2d 803, 807–08 (Mo.1984) (en banc)). The jury instruction given in this case required only a finding of malice in law, as opposed to legal or actual malice. Missouri Courts recognize that "[l]egal malice requires proof of a mental state whereas malice in law rests upon a legal presumption independent of any proof concerning a defendant's mental state." *Proctor v. Stevens,* at 687. Thus, in finding for plaintiff, the jury made no determination as to whether debtor acted out of any improper motive or, more pertinently, whether debtor's actions were targeted at Princess House.

Plaintiff also argues that it was "certain or substantially certain" to lose sales if debtor and those downline of her took on a second product line, and that debtor therefore acted with malice in contacting the eight representatives. Based on this argument, Plaintiff contends that the entire damages award should be nondischargeable.[5] Such reasoning ignores the requirement in *Long* that debtor's actions be targeted at the creditor, and if adopted, would mean that intentional actions of a debtor, which have the incidental effect of harming a plaintiff, would be considered malicious. But, as the Eighth Circuit has held, "[f]or conduct to be malicious under *Long* ... the conduct must not only be 'certain or almost certain to cause ... harm,' it must also be targeted at the creditor." *In re Miera,* 926 F.2d 741, 744 (8th Cir.1991), citing *In re Long,* 774 F.2d at 881. In other words, I must find that debtor's conduct was motivated by an "intent to cause injury" to plaintiff, "rather than [being] merely an 'intentional act which causes an injury.'" *Long* at 880. *See also City of Colton v. Corbly (In re Corbly),* 61 B.R. 851, 855 (Bankr.D.S.D.1986). This distinction often arises in cases involving economic injury, where a debtor may be motivated by some desire other than to simply harm the creditor. In *First Nat'l Bank of Fayetteville, Arkansas v. Sisemore (In re Phillips),* 882 F.2d 302 (8th Cir.1989), debtors had granted the creditor a security interest in a lease payment which was supposed to go directly to the bank. When the payment was deposited into debtors' account by mistake, debtors did not inform the bank of the error, but used the funds. The Court held that this action was not malicious because the debtors used the funds in an attempt to keep their business viable, and not because they intended to harm the creditor. *Id.* at 305. In *United States v. Vandrovec (In re Vandrovec),* 61 B.R. 191, 198 (Bankr.D.N.D.1986), the court found that debtor's overriding consideration in disposing of the collateral was not to harm the creditor, but to market the corn before it became unmarketable. *See also Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir.1993) (per curiam); *Franklin State Bank v. Lippert (In re Lippert),* 84 B.R. 612, 619 (Bankr.D.Minn.1988); *Shelbina Mercantile Bank v. Durbin (In re Durbin),* 58 B.R. 259, 263 (Bankr.E.D.Mo.1986). In these cases, which often involve sale of a creditor's collateral, courts are generally unwilling to infer malice if debtors' actions are motivated primarily by an intent to preserve their own assets.

By the same token, Courts are willing to infer malice if debtors harm the creditor without benefit to themselves, or if debtors

---

**5.** I note that the jury instruction as to misappropriation of trade secrets contained no element of willfulness or intent, much less malice. Pl.Ex. # 13, at pg. 33.

engage in a pattern of deceit. Thus, in *North Tel, Inc. v. Brandl (In re Brandl)*, 179 B.R. 620 (Bankr.D.Minn.1995), the debtor used a computer virus to destroy the creditor's business records. *Id.* at 622. In finding the debt nondischargeable, the Court found that debtor could only have been motivated by a desire to harm the creditor, as he could in no way benefit from the action. In *United States v. Foust (In re Foust)*, 52 F.3d 766, 768 (8th Cir.1995), the Court inferred malice when debtor engaged in a pattern of deceit by selling his corporation's crop at distant elevators, depositing proceeds in his personal accounts, reporting small yields to FmHA, and claiming someone stole crop from his silo. And, in *Pulley v. Langfitt (In re Pulley)*, 196 B.R. 498, 501 (Bankr. W.D.Ark.1995), the Court found debtor acted maliciously by hiding the location of creditor's property until the property had been removed and destroyed. In *Pulley* there was both a lack of benefit to the debtor and the element of deceit.

 Ultimately, for dischargeability proceedings, malice turns on the debtor's purpose in undertaking the prohibited actions. Ms. Kraft testified credibly, and without contradiction, that she was motivated by a desire to replace her lost income. It was unrefuted that debtor's income decreased by more than thirty percent between 1983 and 1989. No one disputed that Princess House was plagued by an inability to fill orders in a timely manner. *See* Deb.Ex. ## 11–24. It was also unrefuted that other organizers for Princess House sold more than one product. Nothing in debtor's own contract with Princess House prohibited her from handling another line. And, she did not know if her eight organizers had any such prohibition in their contracts.

As announced at the hearing, Princess House failed to prove that debtor was motivated by a desire to cause economic harm or that her actions were targeted at Princess House. Debtor began representing Princess House at the age of nineteen, and, while raising a family, she had spent eighteen years building her Princess House business. She did not walk away from Princess House when it had supply problems, as she could have done, and she did not encourage others to do so. Instead, she took on an additional line so that she could replace income lost due to such supply problems. Such motivation can hardly be characterized as malicious. I find that plaintiff has not met its burden of showing that debtor acted with malice.

Debtor has proven that she can be a productive member of society. Discharge of her obligation to Princess House will give her "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971). I expect her to make the most of that opportunity.