**In re Fred KRAUTHEIMER, Debtor.**

**Philip D. Rupert, Jr., Plaintiff**

**v.**

**Fred Krautheimer, Defendant.**

**Bankruptcy No. 94–B–20027 (JJC).**
**Adversary No. 94–5039A (JCC).**

United States Bankruptcy Court,
S.D. New York.

Nov. 17, 1999.

---

See also 210 B.R. 37.

O'Keeffe & Lindgren, By Richard J. O'Keeffe, White Plains, NY, for Plaintiff.

Fred Krautheimer, Tarrytown, NY, Pro Se.

## DECISION AND ORDER

JOHN J. CONNELLY, Bankruptcy Judge.

In this adversary proceeding, the plaintiff, Philip D. Rupert, Jr. ("plaintiff" or

"Rupert"), seeks a determination that the $889,238.50 debt owed by the Debtor, Fred Krautheimer ("Krautheimer" or the "Debtor"), is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). The debt arose from Plaintiff's state court judgment against the Debtor for tortious interference with contract. The Plaintiff had an employment contract with the Debtor's company until the Debtor terminated him. Rupert subsequently commenced an action against the Debtor in state court. The jury determined that the termination was not for cause and awarded the Plaintiff damages.

Previously, in this Court, the Plaintiff moved for and was denied summary judgment on the complaint. In its decision, *In re Krautheimer*, 210 B.R. 37 (Bankr. S.D.N.Y.1997), the Court determined that the Plaintiff's state court judgment ("State Court Judgment") was not entitled to collateral estoppel effect on the issue of dischargeability. One important reason for denying the State Court Judgment collateral estoppel effect was that the jury instructions were ambiguous. The Court determined that the instructions were tailored in such a manner which precluded even a finding of implied malice by the Debtor; however, as this Court noted, such evidence could be adduced at trial. *Krautheimer*, 210 B.R. at 48. Thus, the Court must now determine whether the injury caused by the Debtor rises to the level of "willful and malicious" so as to preclude discharge [1] under 523(a)(6).

The parties have agreed to submit this matter to the Court based upon the record created in the state court proceeding, in lieu of a trial before this Court. Thus, this Court did not have the benefit of hearing live testimony, assessing the credibility, and observing the demeanor of the plaintiff, the defendant, and any other witnesses and thus, bases its decision on the trial transcript from New York Supreme Court, Monroe County, Index No. 91–09564 ("TR.") as well as various documents, including the employment contract and the termination letter to Rupert. That notwithstanding, the Plaintiff must still show by a preponderance of evidence that Section 523(a)(6) prevents this debt from being discharged.

### Background

The following is the background of the events leading up to the complaint before the Court.

In 1982, Krautheimer, a dentist and resident of Tarrytown, New York, began to sell medical and dental insurance in the lower Hudson Valley for R.W. Michael's Agency, Inc. (the "Corporation"), a small insurance company with its headquarters in Orchard Park, New York, outside of Buffalo. In 1988, the owner of the business indicated that he wished to sell the Corporation.

Without understanding the financial condition of the Corporation, Krautheimer agreed to buy the Corporation in partnership with Robert Lohnes ("Lohnes"). At the time, Lohnes was the Senior Vice President of the Corporation and a man whom Krautheimer greatly trusted and relied upon. (TR. at 371–73, 378). In December 1988, in order to purchase the Corporation, Krautheimer and Lohnes each paid $100,000 and they jointly signed a promissory note for $1.6 million. (TR. at 379).

Prior to this partnership agreement, Lohnes had been an employee of the Corporation for twenty-five years; during that time, Lohnes had successfully climbed his way up the proverbial corporate ladder. (TR. at 44). In contrast, Krautheimer, admittedly, had no experience in the insurance business other than sales. (TR. at 642). His primary function became "professional relations" and his secondary function became sales. (TR. at 374, 381). Thus, the day-to-day operations of the

---

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Corporation were left to Lohnes. (TR. at 374).

In late 1989, Lohnes became terminally ill. As a result, Krautheimer was forced to search for a new partner in the business. (TR. at 383–90).

At the suggestion of Lohnes, in early 1990, Krautheimer went to Commercial Life Insurance Company ("Commercial Life") to discuss finding a new person to run the company. (TR. at 389). It is important to understand that Commercial Life and the Corporation worked together to sell insurance. The Corporation generated a large portion of its revenue by receiving commissions from the Commercial Life policies it sold. The commissions were based upon variable percentage arrangements for insurance policies sold with Commercial Life as the insurer. As a result, the Corporation's fate was to some extent tied to that of Commercial Life. Accordingly, the decision to include Commercial Life in the process of finding Lohnes' successor was designed to provide assurance that the Corporation would be properly managed in the future.[2]

One of the candidates offered by Commercial Life representatives as a possible replacement for Lohnes was the Plaintiff, Rupert. (TR. at 52, 391). Neil Brown ("Brown"), a Commercial Life employee at the time, (TR. at 58–60), brought Krautheimer and Rupert together. (TR. at 394). It was Brown's intention to be included in the new venture. (TR. at 54–60, 390–406).

Initially, Rupert was not interested in being involved with the Corporation. (TR. at 53). The Corporation had financial difficulties due to an imbalance in its "loss ratios." (TR. at 46, 49). A witness for the Plaintiff, Brown, defined a loss ratio as the percentage of claims to premiums written. (TR. at 47). As Brown stated

> in simple [ ] terms, ... if its a 300 percent loss ratio, for instance, it goes the same for every dollar you take in you got to pay three dollars out. [The][l]oss ratio [at the Corporation] started to escalate rapidly ... [t]hey started really going badly [sic], and that was very much of a concern for [Commercial Life].

(TR. at 47–48).

Brown testified that he was interested in joining the Corporation because it had potential for growth and profit. (TR. at 60). Brown stated, "I knew that some of the corrective measures that were in place hadn't been started yet, and there was [sic] lots of other things we could do, and with [Rupert's] background, I just thought this was going to be a great thing." (TR. at 60). After several meetings with Krautheimer and at the urging of Brown, Rupert agreed to accept a position as President of the Corporation.

In June 1990, Lohnes died. Following Lohnes' death, Krautheimer was left as the sole guarantor of the $1.6 million note. (TR. at 392, 410).

Shortly thereafter, in July of 1990, the Corporation and Rupert executed an employment contract ("Employment Agreement"). Under the terms of the Employment Agreement, Rupert was to receive $75,000/year plus 33.3% of the profits for eight years.

Rupert was employed by the Corporation from August, 1990 to June, 1991. On June 10, 1991, Krautheimer and the Corporation terminated Rupert.[3] (TR. at 248). One week later, Rupert commenced an action against the Corporation, Krautheimer, and two other Defendants in New York Supreme Court, Monroe County.

---

2. It was clear to Lohnes, Krautheimer, and Commercial Life that Krautheimer would need assistance in running the Corporation. (TR. at 52, 389–90).

3. The letter stated, "[d]ue to your consistent actions consisting amongst other things, disloyalty, abuse of power and failure to comply with the policy of this company, we hereby terminate your employment effective June 11, 1991."

This decision focuses on Rupert's employment with the Corporation and the circumstances surrounding his termination in June of 1991. The Court must determine whether Krautheimer's acts created a nondischargeable debt as described in Bankruptcy Code Section 523(a)(6). For the reasons set forth below, the Court has concluded that Section 523(a)(6) cannot preclude discharge of the debt because Krautheimer's course of conduct was not willful and malicious.

### State Court Jury Verdict and Judgment.

Two causes of action were submitted to the jury: first, Rupert's claim against the Corporation for breach of contract and second, Rupert's claim against Krautheimer for tortious interference with contract. (TR. at 705).

On October 27, 1993, the jury entered a verdict for Rupert and against the Corporation and Krautheimer. The jury specifically found that: (1) the Corporation breached the Employment Agreement, (2) Krautheimer unduly interfered with the Employment Agreement by inducing the Corporation (R.W. Michaels Agency, Inc.) to breach the Employment Agreement, and (3) awarded $725,000 in unspecified "damages," plus interest and costs, for a total of $889,238.[4]

The judge instructed the jurors to evaluate the claim for breach of contract by the Corporation separately from the claim for tortious interference with contract by Krautheimer. Specifically, the court instructed the jury to consider the Corporation and Krautheimer as "distinct." (TR. at 706). As this Court stated in *Krautheimer*, "The finding of breach of contract by the Corporation has no bearing, in itself, on whether Krautheimer committed a 'willful and malicious injury' upon Rupert. And, of course, breach of contract is not a basis for non-dischargeability [against

Krautheimer] in section 523(a)(6) actions." *Krautheimer*, 210 B.R. at 53 (citing *In re Kressner*, 206 B.R. 303 (Bankr.S.D.N.Y. 1997)). The breach of contract cause of action resulted in judgment against the Corporation, not Krautheimer. Thus, the breach of contract finding by the jury is not relevant to the Court's determination of whether Section 523(a)(6) applies to the $889,238 debt.

This Court must only consider the tortious interference with the contract claim. The jury instructions on this claim were ambiguous and as a result two problems arose in interpreting the jury verdict. First, as discussed at length in the *Krautheimer* opinion, the court's instructions did not require the jury to find Krautheimer acted maliciously to impose liability. *Krautheimer*, 210 B.R. at 54. Second, the elements of tortious interference with contract were not properly explained to the jury. (TR. at 710–11).

The jury instructions stated that a "person who acts outside the scope of their corporate authority for malice *or* for other motives ..." may be guilty of tortious interference. (TR. at 711)(emphasis added). The use of the word "or" is significant; it means that the jury's positive response to the question "[d]id the [D]efendant, Fred Krautheimer, unduly interfere with the employment contract by inducing the [Corporation] to breach the contract with the [P]laintiff, Philip D. Rupert, Jr." did not necessarily decide the issue of malice. (TR. at 727). Furthermore, "[a] thorough examination of the trial record fails to reveal any basis to conclude that the jury finding of tortious interference necessarily constituted a finding that Krautheimer committed a willful and malicious act as defined in the bankruptcy precedents." *Krautheimer*, 210 B.R. at 53.

---

4. According to the state court transcript, Rupert did seek punitive damages, but this claim was not submitted to the jury. (TR. at 638, 712–15). In addition, the jury did not allocate the damages between the Corporation and Krautheimer. (TR. at 727–28).

■ Another problem with the jury instructions related to the explanation of the elements of tortious interference, as applied to Krautheimer. Under New York law, the elements of tortious interference with contract claim are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Ligaya v. American Friends of the Hebrew Univ., Inc.*, 1998 WL 146227, at *9 (S.D.N.Y. March 25, 1998) (citations omitted).

■ Generally, the tort of interference with an employment contract cannot lie against a party to the contract or against an agent of the company, absent a showing that they acted outside the scope, or exceeded the bounds, of their authority. *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir.1996); *Kosson v. Algaze*, 203 A.D.2d 112, 610 N.Y.S.2d 227 (1st Dept.1994)(tortious interference with an employment contract cannot lie against agents of the employer, absent a showing that they acted outside the scope of their authority). Such a showing would qualify a defendant-employee as a "third party" capable of tortious interference with contract. *Finley*, 79 F.3d at 1295.

In *Finley*, the plaintiff, a medical director at a county hospital who resigned from her position, brought action against the county commissioner of hospitals alleging tortious interference with contract. The county commissioner sought the plaintiff's resignation only six months after she was hired. It was acknowledged that the county commissioner sought the medical director's resignation "not [for] any grievous or erroneous problem." *Finley*, 79 F.3d at 1289. Rather it "was an incapability [sic] as far as management styles were concerned." *Id.* at 1289. The county commissioner had direct supervisory authority over the plaintiff and the plaintiff never challenged the commissioner's supervisory powers. *Id.* at 1295. The New York

Court of Appeals held that the county commissioner was not a third party to the alleged contract and the commissioner did not act beyond the scope of his authority in requesting the plaintiff's resignation. *Id.* Thus, the claim for tortious interference with contract could not succeed.

In the instant case, the state court jury instructions did not recognize the importance of establishing Krautheimer as a "third party" in determining liability on tortious interference with contract. The totality of the instructions on the claim were:

A person who, with knowledge of the existence of a contract, intentionally and improperly induces one of the parties to the contract to breach the contract is responsible to the other party for any damage he suffers as a result of the fact that the contract has not been carried out. Knowledge means actual awareness, but knowledge need only be of the existence of the contract; not of its detailed terms.

An act induces the breach of a contract if it is a substantial factor in preventing the completion of the contract. It is intentional if done deliberately with the purpose of interfering with the rights of the party to the contract.

The [P]laintiff in this case bears the burden of proof to establish the existence of a valid contract, knowledge of the contract on the part of the [D]efendant, Dr. Krautheimer, the intentional inducement of the [C]orporation to breach the contract and damages.

If the [P]laintiff has established these elements and act, inducing the breach of a contract would nevertheless not be improper if the [D]efendant's conduct was reasonable, taking into consideration the relation between him and the other parties to the contract and the interest which he sought to advance or protect, the [D]efendant, Dr. Krautheimer, bears the burden of proof to establish that his action which induced the breach of contract was reasonable.

In this regard, when a [D]efendant's interest is equal to or superior to that of the [P]laintiff, he is privileged, that is, he has the right to interfere with the [P]laintiff's rights, provided he does so by lawful means, and not for the sole purpose of injuring the [P]laintiff. Thus, for example, the financial interest of a stockholder of a corporation or the fact that someone is a corporate officer may justify procuring the discharge of an employee who has a contract of employment with the [C]orporation for a stated term.

Conversely, *a person who acts outside the scope of their corporate authority* for malice or for other motives of personal, as distinct from corporate, interests, does not act with reasonable justification and *would be personally liable for any interference with the contract.*

(TR. at 710–11)(emphasis added). As the previously discussed New York authority demonstrates, the underlined portion of the jury instructions above mention an important element of tortious interference with contract. *See Finley,* 79 F.3d 1285; *Kosson,* 203 A.D.2d 112, 610 N.Y.S.2d 227. Nevertheless, the jury instructions do not coherently explain that this element was a prerequisite for a tortious interference with contract claim given Krautheimer's relationship to the Corporation and the Employment Contract.

The threshold issue with the tortious interference claim should have been whether the Plaintiff could establish Krautheimer acted as a "third party." As discussed below, due to Krautheimer's relationship to the contract either as a party or as an agent of the Corporation, Krautheimer had to act "outside the scope of [his] authority" in order to be deemed a third party capable of tortious interference with contract.

■ The Employment Agreement was signed by Krautheimer twice. He signed once on behalf of the Corporation and once after the words "consented to" which were beneath the signatures of the Corporation and Rupert. While these two signatures make Krautheimer's relationship to the Employment Agreement unclear, it is clear that he acted as either an agent of the Corporation or as a party to the contract. Since Krautheimer was not a traditional "third party" as contemplated by New York law, Rupert was required to show that Krautheimer acted outside the scope of his authority.

■ As the Court concluded in *In re Joseph,* 22 B.R. 319, 322 (Bankr.E.D.N.Y. 1982), "Officers and directors of a corporation are not liable for inducing the corporation to breach a contract." (Citations omitted). "While this immunity is not absolute, the privilege protects officers and directors who act within the scope of their authority." *Id.* The rationale behind this holding is that otherwise, every corporate breach of contract would lay the corporation's officers open to individual tort liability. *Id.*

Upon a detailed examination of the state court transcript, this Court does not find a scintilla of evidence that Krautheimer exceeded his authority as CEO in terminating Rupert. Krautheimer was the CEO of the Corporation. It was undisputed that Krautheimer had a supervisory power over Rupert by both the terms of the Employment Agreement and the nature of his position. (Employment Agreement at ¶ 2.) Terminating Rupert under these circumstances was not, and could not be, an act outside the scope of Krautheimer's authority. Indeed, if Krautheimer, as CEO, had exceeded the scope of his authority in terminating Rupert, then there was no one at the Corporation who could terminate Rupert.

■ For all of these reasons, this Court believes that the state court judgment was incorrect and not supported by New York case law. Regardless of its own independent analysis on this issue, the Court cannot disregard the State Court Judgment. *Krautheimer,* 210 B.R. at 52.

What is at issue here is the dischargeability of the state court judgment under Bankruptcy Code Section 523(a)(6). Rupert's claim with regard to dischargeability based on this section was not before the state court judge or jury, and such a claim can only be decided in this Court.

### Findings of Fact.

Upon a thorough examination of the state court trial transcripts, this Court makes the following Findings of Fact to determine whether Krautheimer's actions and conduct rose to the level of a Section 523(a)(6) violation:

1. In July 1990, the Employment Agreement was entered into between Rupert and the Corporation.

2. In August 1990, Rupert began working for the Corporation. (TR. at 411).

3. The Employment Agreement provided, *inter alia,* for an eight year term at $75,000/year plus 33.3% of the profits. (TR. at 553–54).

4. The Employment Agreement initially was for a five year term but it was lengthened to an eight year term. (TR. at 326). The reason for the additional commitment was that Rupert was supposed to secure or assist in refinancing the $1.6 million note. (TR. at 326, 409). A more favorable interest rate was anticipated but the new loan never came to fruition. (TR. at 418–19).

5. The Employment Agreement provided that Rupert could be terminated, "by the [Corporation] on one day's written notice to Rupert in the event Rupert commits any act which may be defined as just cause under the laws of the State of New York, such as dishonesty or disloyalty." (Employment Agreement at ¶ 11).

6. On June 10, 1991, Krautheimer, on behalf of the Corporation, terminated Rupert on one day's written no-

tice. (TR. at 248). This notice was in conformity with the terms of the Employment Agreement.

7. On or about June 17, 1991, Rupert commenced suit against the Corporation, Krautheimer, and two other Defendants in New York Supreme Court, Monroe County, Index No. 91–09564.[5]

8. The state court complaint alleged breach of contract on the part of the Corporation and tortious interference with contract on the part of Krautheimer.

9. On October 27, 1993, Rupert obtained a jury verdict against both the Corporation and Krautheimer for $725,000. in damages plus interest and costs for a total of $889,-238.50.

10. The damages awarded by the jury did not allocate separate amounts for the breach of contract or tortious interference with contract.

11. Krautheimer did not appeal the State Court Judgment.

12. In January 1994, Krautheimer filed a voluntary petition under Chapter 7.

13. On March 10, 1994, Rupert filed the instant adversary proceeding.

The following Findings of Fact relate to Rupert's employment with the Corporation between August 1990 and June 1991:

14. Rupert, without authorization, used company funds to rent a boat for his own personal use. (TR. at 294–95).

15. Rupert, without authorization and in contravention of his Employment Agreement, reimbursed himself for legal bills he incurred prior to his employment with the Corporation. (TR. at 309–13).

16. In October of 1990, Krautheimer relocated the Corporation's headquarters from Orchard Park, New

**5.** The claims against the other two Defen-

dants were either abandoned or dismissed.

York to Rochester, New York so that Rupert could be closer to his home. (TR. at 191, 414). Krautheimer was not contractually obligated to relocate the Corporation for Rupert's benefit. (TR. at 191, 414).

17. Rupert, without first obtaining approval and in contravention of his Employment Agreement, leased a luxury car at the expense of the Corporation. (TR. at 271–74; Employment Agreement at ¶ 4).

18. On May 14, 1991, Rupert wrote to Krautheimer, "Neil and I will not continue to allow you to micro-manage the agency. You hired us to run the agency. Our contract details our job structure, and we will not put up with you going around us. If you have a question about production and/or agents, call Neil. If you have a question about operation and/or carrier involvement, call me. Yes, Fred, as I have previously stated to you, you own the stock and you own the $1,600,000 obligation. If you do not have any employees, you are flat out of business because no other market will handle the specialties. The current employees will not continue unless you lay off." (TR. at 663).

19. At the end of May 1991, Krautheimer revoked Rupert's corporate credit card. (TR. at 242–46).

20. At the end of May 1991, Krautheimer asked Rupert to resign. Rupert refused and Krautheimer began reducing Rupert's ability to function effectively as President of the Corporation. (TR. at 241–46, 257).

21. Rupert threatened to leave the Corporation and open a competing insurance company, (quoting a letter from Rupert to Krautheimer which stated, "Neil [Brown] and I do not have any non-compete clauses in our contracts with [the Corporation]. I am fairly sure that Commercial Life would look favorably on licensing a new agency with Neil and I involved. This is not my desire, but certainly a viable option if we cannot fully resolve our problems."). (TR. at 444).

22. At various times, Rupert undermined Krautheimer's relationship with Commercial Life. (TR. at 322, 325). For example, a letter dated May 16, 1991 from Rupert to John Gaertner of Commercial Life stated, "[w]e are experiencing a great deal of trouble with Dr. Fred [Krautheimer], but what is new? I hope that you gave him some good advice this week, I am very interested to find out how that went." (TR. at 655). Less than one week later, on May 21, 1991, Rupert wrote to Mike Barron of Commercial Life, "[s]orry to get you involved, but with Fred [Krautheimer], it is very hard to control him. His ego rules, and he will not listen to reason." (TR. at 656).

23. In May 1991, Rupert, without consultation or approval, ceased sending weekly business reports to Krautheimer.[6] (TR. at 446–47).

24. On June 3, 1991, Krautheimer revoked Rupert's check-writing authority, thereby making it more difficult for Rupert to pay corporate bills and otherwise oversee the day-to-day operations as required in his Employment Agreement. (TR. at 241–46).

25. Krautheimer requested that Rupert attend a board meeting

---

6. While this duty was not specifically enumerated in the Employment Agreement, it was a request that Krautheimer had made near the beginning of Rupert's employment; moreover, Rupert was, according to the contract, "subject to the supervision and control of Fred Krautheimer" and "subject to the general direction and control of Fred Krautheimer." (Employment Agreement at ¶ 2.).

scheduled for June 10, 1991 in the Corporation's headquarters in Rochester, New York. (TR. at 243).

26. Rupert acknowledged he received notice of the June 10, 1991 board meeting, but without explanation he did not attend the meeting. (TR. at 243).

27. At the time the board meeting was held, Rupert was not aware that Krautheimer was going to terminate his employment with the Corporation. (TR. at 243).

28. When Rupert was terminated, the Corporation was still operating at a loss. (TR. at 319, 340).

29. When Rupert was terminated, none of the new computers, which were supposed to make the Corporation more efficient, had even been installed. (TR. at 317, 340).

30. The following allegations were made by Rupert in an effort to discredit Krautheimer and were not disputed by the Defendant's attorney: Krautheimer unilaterally raised his own salary, (TR. at 228), attempted to raise his wife's salary, (TR. at 229), and wanted his son, Eric, to work for the Corporation over his summer vacation. (TR. at 230–31).

### Legal Standards.

■ Bankruptcy Code Section 523(a) sets forth specific circumstances where a debt is nondischargeable. Pursuant to Section 523(a)(6), any debt attributable to a "willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable. The terms "willful" and "malicious" are separate elements, and both elements must be satisfied. *Krautheimer*, 210 B.R. at 47 (citing *In re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985)).

■ The purpose of section 523(a)(6) is to avoid rewarding blameworthy debtors

through discharge. As one commentator has noted:

Discharge in bankruptcy is an equitable form of relief ..., it will not be allowed in cases where debts arose from conduct involving egregious circumstances. Thus, debts for willful and malicious injury are morally distinguishable from other types of debt deserving of discharge.... Indebtedness resulting from this type of [socially reprehensible] conduct is not worthy of discharge in bankruptcy.

Ahrend and Thomsen, *Tort Claims and Judgments as Debts for "Willful and Malicious Injury" Nondischargeable Under Section 523(a)(6) of the Bankruptcy Code*, 100 Com. L.J. 498, 498, 531 (1995).

■ The term "willful" means deliberate or intentional. *In re Stelluti*, 94 F.3d 84, 87 (2d Cir.1996). Recently, the Supreme Court clarified the scope of "willful" in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). *Kawaauhau* addressed the dischargeability of a debt based on a medical malpractice judgment arising from the doctor/debtor's negligent or reckless conduct. The Court identified the issue as whether Section 523(a)(6) covers acts done intentionally which cause injury, or only acts done with the actual intent to cause injury. *Id.* at 977. The Supreme Court stated:

The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury".

*Id.* at 977. Thus, under *Kawaauhau*, it is the resulting harm or injury which must have been willful or intentional, not the action by the debtor that caused the harm. *Kawaauhau*, 118 S.Ct. at 977; *In re Hartley*, 869 F.2d 394, 395 (8th Cir.), *reh'g denied*, 874 F.2d 1254 (1989).

Although *Kawaauhau* clarified the meaning of "willful," it did not specifically address the meaning of "malicious." *In re Powers,* 227 B.R. 73, 76 (Bankr.E.D.Va.1998)(noting that in *Kawaauhau,* the Supreme Court did not address the malice prong of § 523(a)(6)); *see also In re Gagle,* 230 B.R. 174, 179 (Bankr. D.Utah 1999). Accordingly, reference must be made to Second Circuit case law which defines "malice."

The malice element of Section 523(a)(6) has generated the most controversy among the courts. As Judge Adlai S. Hardin explained in *In re Luppino:*

> The basic issue is whether this term requires a showing of intent on the debtor's part to inflict injury on the creditor (referred to as actual or Biblical malice), or whether some lesser standard is contemplated by the statute, such as an intent to do the act causing the harm coupled with knowledge that the act will cause harm or, lesser still, reckless disregard of the harmful consequences of the act. The Supreme Court, in a decision by Justice Ginsburg in *Kawaauhau v. Geiger,* appears to have instructed that actual or Biblical malice is required.... The Second Circuit in *Navistar Financial Corp. v. Stelluti (In re Stelluti),* has ruled that actual malice may be proved by circumstantial evidence of the facts and circumstances surrounding the debtor's conduct.

*In re Luppino,* 221 B.R. 693, 699–700 (Bankr.S.D.N.Y.1998) (citations omitted).

■ In *Stelluti,* the Second Circuit stated, "[t]he term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Stelluti,* 94 F.3d at 87. Malice may be constructive, that is, implied "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Id.* at 88, *quoting In re Stanley,* 66 F.3d 664, 668 (4th Cir.1995).

Judge Stuart M. Burstein, in a post-*Kawaauhau* decision, explained the "malicious" element of § 523(a)(6) as follows,

"[a] specific intent to harm or injure is not required. Malice is implied when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *In re Mitchell,* 227 B.R. 45, 51 (Bankr.S.D.N.Y.1998) (citations omitted)(internal quotation marks omitted).

■ The burden is on the Plaintiff Rupert to show, by a preponderance of the evidence, that the debt arose due to "willful and malicious injury by the debtor" as required by Section 523(a)(6). *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Any doubts about the evidence are resolved in favor of the debtor. *In re McLaren,* 990 F.2d 850, 853 (6th Cir.1993).

***Analysis.***

The two elements of Section 523(a)(6) require a showing that: (1) Krautheimer deliberately and intentionally caused the resulting injury to Rupert and (2) Krautheimer acted with malice. Here, such injury was determined by the jury to be damages of $725,000 for tortious interference with contract (and breach of contract by the Corporation). The issue is whether Krautheimer's actions were willful and malicious, thereby creating a debt which is non-dischargeable in bankruptcy.

■ The fact that the jury ultimately found no legal grounds for termination existed is not outcome determinative on the issue of dischargeability pursuant to section 523(a)(6). It is well-settled that it is within the exclusive purview of the bankruptcy court to decide whether a debt is dischargeable. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). As previously discussed, the state court verdict did not specifically determine whether Krautheimer's conduct was "willful and malicious" and indeed such a finding was not necessary under those circumstances to find liability.

Several considerations caused this Court to conclude that Section 523(a)(6) cannot preclude discharge in the instant case. For example, Rupert's direct testimony would lead one to believe that once he had the Corporation turning a profit and computerized, Krautheimer then maliciously terminated him for no valid or justifiable reason. (TR. at 211–27). However, during his cross-examination, Rupert admitted that the Corporation still was unprofitable when he was terminated and no computers had been installed. (TR. at 317–19, 340).

> Q. So, you hadn't turned the corner when you were discharged from the agency in terms of revitalizing the bookkeeping; true?
>
> A. That's true.
>
> Q. And when you were discharged from the agency, the agency was still operating at a loss, wasn't it?
>
> A. Yes, it was operating at a loss.
>
> Q. It wasn't profitable?
>
> A. No.

(TR. at 319).

Furthermore, Rupert acknowledged the following salient and damaging facts on cross-examination: (1) he did not receive approval prior to leasing his company car, as required under the Employment Agreement, (TR. at 270–74); (2) Rupert used company funds to pay for a boat that he used for personal reasons while in Florida, (TR. at 294–95); and (3) Rupert used company funds to pay for legal expenses incurred prior to his employment at the Corporation. (TR. at 309–13).

It is further clear from the trial transcript that Rupert's employment at the Corporation was rarely without rancor. The testimony of Neil Brown, a friend of Rupert's and a former employee of the Corporation, indicated that problems were evident as early as November of 1990. He testified that "I thought the thing was falling apart, and I had applied for my retirement. It looked like my job was going to fall apart and there was something adverse going on between Dr. Fred [Krautheimer] and Pete [Rupert] now." (TR. at 75).[7]

As this Court's Findings of Fact demonstrate, the record is replete with strong evidence that Krautheimer did not deliberately or intentionally injure Rupert or act with malice. For example, Krautheimer testified and produced documentary evidence regarding various incidents of Rupert's disloyalty and insubordination. (TR. at 433, 440–48).

Krautheimer provided a reasonable and credible explanation for terminating Rupert on June 10, 1991. (TR. at 248). According to Krautheimer, two events fueled the termination: first, on that day, he became aware that Rupert had leased a Cadillac without approval and second, on the very same day, Rupert, without explanation, did not attend a board meeting which Krautheimer had called. (TR. at 243). Indeed, the record indicates that Krautheimer may well have been justified in terminating Rupert's Employment Agreement.

Based upon all of the aforementioned facts and circumstances, the Court concludes that Krautheimer did not willfully cause Rupert injury. Neither the Findings of Fact nor the entire state court transcript reveal any basis for finding Krautheimer deliberately or intentionally caused Rupert injury. Even assuming *arguendo* that all the substantive allegations

---

**7.** Krautheimer testified that he became displeased with Rupert in January of 1991. The nature of Krautheimer's complaints at this time focused on Rupert's allegedly disrespectful "intonations." (TR. at 424, 433–40). The Court did not rely on these particular complaints raised by Krautheimer, as it is simply not possible to ascertain the validity of these concerns, from the record before the Court.

Live testimony would have afforded the Court a more effective means of weighing the witness' credibility on this issue. However, as previously discussed, both the Plaintiff and Defendant waived the right to introduce live testimony. In any event, the testimony regarding the Plaintiff's allegedly disrespectful intonations is not essential to the Court's determination.

made against Krautheimer were true, such actions would prove less than the requisite intent to injure pursuant to Section 523(a)(6).

In contrast, the Findings of Fact detail numerous incidents of inappropriate conduct on the part of Rupert. From his unauthorized reimbursement of personal expenses to his failure to comply with several of Krautheimer's directives, Rupert acted, in this Court's view, in a manner that justified his termination.[8] Thus, there can be no finding that Krautheimer deliberately and intentionally caused Rupert's injury.

While unnecessary to support the holding of this decision, the Court shall briefly address the "malicious" element of Section 523(a)(6). Malice, as previously discussed, can be inferred from the Debtor's actions. Here, the Court cannot find or even infer any indication of malice in Krautheimer's actions.[9] Rather, Krautheimer demonstrated his good faith by moving the Corporation's headquarters for Rupert's benefit and for some time, Rupert had nearly unrestricted control over the Corporation's operations. Furthermore, as previously discussed, Rupert did not improve the financial health of the Corporation and the Corporation was still unprofitable upon his termination. In light of Rupert's abuses of check writing privileges and the Corporation's continued financial difficulties, the actions which Krautheimer took to restrict Rupert's authority were simply rationale business decisions, not acts of malice.

## CONCLUSION.

After considering the facts and testimony elicited in the state court transcript, the Court finds that the Plaintiff has not established by a preponderance of the evidence that Krautheimer's debt was attributable to "willful and malicious injury by the debtor to another entity or the property of another entity," as mandated by Section 523(a)(6). The evidence set forth by the Plaintiff is paltry and unconvincing; the record indicates that Krautheimer believed himself to be acting within the parameters of his rights under the Employment Agreement. Under the totality of the circumstances enumerated above, the Court cannot find that Krautheimer willfully and maliciously caused Rupert harm.

For the aforementioned reasons, the Plaintiff's complaint is dismissed and the relief requested pursuant to 11 U.S.C. § 523(a)(6) is denied.

**SO ORDERED.**

---

8. It is undisputed that Krautheimer was contractually permitted to terminate Rupert's Employment Agreement for "any act which may be defined as just cause" on one day's written notice. Employment Agreement at ¶ 11.

9. A case on point is *In re Kraft,* 197 B.R. 660 (Bankr.W.D.Mo.1996) in which a creditor commenced an action, seeking nondischargeability determination as to a judgment debt

arising from an earlier federal court suit in which the jury found that the debtor engaged in tortious interference with a contract while working as an organizer in the creditor's direct sales organization. Following denial of creditor's summary judgment motion, the Bankruptcy Court held that the creditor failed to show that the debtor acted with malice. *Id.*