In re Tracy Alan **PRICE**, Jill Jaeann Price, Debtors.

Ted **SMITH**, Plaintiff,

v.

Tracy Alan **PRICE**, Jill Jaeann Price, Defendants.

Bankruptcy No. 90–30006–SW.
Adv. No. 90–3015–SW.

United States Bankruptcy Court, W.D. Missouri.

Feb. 19, 1991.

792

Joseph B. Phillips, Stockton, Mo., for plaintiff.

Gerald D. McBeth, Nevada, Mo., for defendants.

ORDER

ARTHUR B. FEDERMAN, Bankruptcy Judge.

I. INTRODUCTION

This is an action to determine whether a debt is non-dischargeable. Debtor Tracy Price is an insurance agent. Debtor Jill Price, his wife, at various times assisted in his insurance business. Through a relative, the Prices met Plaintiff Ted Smith. Smith, who is now 79 years old, is retired after having worked various jobs as a laborer. He has a fourth grade education, and little experience in financial matters. Nevertheless, prior to meeting the Prices, he had managed to accumulate in excess of $50,000.00. Unfortunately, over a period of time, Mr. Smith lent that amount of money to Mr. Price, and has only been paid back $1,000 of such funds. The Prices filed a Chapter 7 proceeding, and Mr. Smith filed a Complaint to determine that his debt is non-dischargeable under § 523(a)(2) and (6) of the Bankruptcy Code. The Court finds in favor of Plaintiff and awards damages against Defendant Tracy Price in the amount of $49,000.00 and against Defendant Jill Price in the amount of $20,000.00,

and further finds such damage awards to be nondischargeable.

## II. FACTS

Mr. Smith met the Prices in October 1987, in Eldorado Springs, Missouri. Mr. Smith, who is from the Kansas City area, was there at a social event at the home of Mrs. Price's mother. The Prices had been living in Kansas, and Mr. Price stated to Mr. Smith that he and his wife wished to move to Eldorado Springs since they had relatives there. Mr. Price stated that if he had some money available to invest in an insurance agency he could make from $400,000 to $500,000 profit per year. The conversation continued, with Mr. Smith indicating that he had funds available to invest. Ultimately, the parties agreed that Mr. Smith would invest up to $50,000 in an agency to be established by Mr. Price, and in exchange would receive 40% of the profits from such agency. This understanding between the parties is reflected in a handwritten paper which was prepared by Mr. Price on or about November 1, 1987, and which bears the names of the Prices, Mr. Smith and Mr. Price's parents, apparently as witnesses. Said document reads as follows:

> Tracy Allen Price and Jill Jaeann Price operating as the Price Insurance Agency are selling to Ted Smith 40% of the profits of our insurance agency beginning operation immediately. For the 40% consideration Mr. Smith will pay initially $10,000 and up to $50,000 if capital is needed. Mr. Smith will be provided a monthly report of sales, expenses, commissions paid, and commissions earned.

At the bottom of the document it states "Received from Ted Smith $10,000. 11–1–87," and is signed by Tracy A. Price. The Prices deposited the $10,000 into an account at Tri–County State Bank, which account was in the name of "Health Insurance Benefits, Tracy or Jill Price".

Mr. Price opened the insurance agency in Eldorado Springs at about the time the first funds were received from Mr. Smith. Rather than selling insurance himself, he largely acted as a broker for other insurance agents. Essentially, Mr. Price's plan of operation was to purchase for cash, at a discount, other insurance agents' rights to receive premiums. Thus, an agent would sell a health or life insurance policy for which his customer would agree to pay a monthly premium. Each month, as that premium was collected, the insurance company would remit to the agent his agreed-upon commission from such payment. Mr. Price would go to an agent and, by paying in cash approximately 40–50% of the yearly premium, would purchase from the agent his right to such monthly premiums. The agent would then execute an appropriate assignment such that the insurance company would thereafter send the commissions to Mr. Price, rather than to the agent.

The problem with Mr. Price's business was that many of the insurance customers who purchased such policies did not or were not obligated to pay on them for the full year. In other words, coverage continued only for each month in which the required premium was paid. So, if Mr. Price purchased an assignment based on his anticipation that premiums would be paid for the full year, and they were not so paid, he was the loser. Mr. Price claims that, without his knowledge, certain of his agents wrote phony policies, sent in the first month's premium along with an application, sold an assignment to him, and thereafter nothing more was collected on such policies. Mr. Price admitted that, prior to purchasing assignments, he did little checking as to the customers involved to determine the likelihood of their continuing to pay the monthly premiums.

There is some dispute as to whether the true nature of this business, and the risks associated with it, were explained to Mr. Smith in advance of his providing the funds. Mr. Smith testified that the collection risk of the future monthly premiums assigned to Mr. Price was never disclosed to him. This testimony was corroborated by the testimony of Ms. Mae Matture. Mr. Price, on the other hand, does not specifically remember discussing this subject with Mr. Price, but testified that he must have disclosed the risks. Debtors offered no

additional evidence to support this assertion.

Subsequent to the November 1, 1987 meeting, Mr. Smith gave Mr. Price an additional $40,000 in increments of $10,000 each. The dates of the payments were November 20, 1987; January 28, 1988; April 12, 1988; June 28, 1988. Meanwhile, both Mr. and Mrs. Price gave Mr. Smith a number of reports on the progress of the business, both by telephone and in writing. Frequently, it was Mrs. Price who spoke to Mr. Smith on the telephone and, according to him, gave "glowing" reports on the business. Essentially, both the Prices advised Mr. Smith throughout this period that the business was growing but that, in order to purchase more assignments, they needed more cash. A number of the written reports referred to "accounts receivable" which were due to the agency. The Prices apparently considered an account receivable to be the commission which they anticipated would be paid to the agency in the future. There is nothing in any of the written documents which advises Mr. Smith that the collection of such "accounts receivable" was dependent upon customers continuing to pay their monthly premiums, nor was there any downward adjustment to the reports as insurance was cancelled and "accounts" went uncollected. Furthermore, during the period when these reports were being generated for Mr. Smith, commissions actually earned by Mr. Price, as reflected in the applications registers, business transmittals, and other insurance company documents, were significantly lower than that reported.

Mrs. Price worked at the agency as a secretary until approximately March, 1988. She was substantially involved in writing checks and related duties for the agency. In March, she began work as an independent contractor to the Postal Service, but continued to participate in the agency's business and to write its checks.

As indicated, the original arrangement between the parties was that Mr. Smith would be entitled to 40% of the profits of the agency. However, at some point the arrangement was converted to a straight loan. Mr. Smith testified that this was because Mr. Price learned that a person could not own an interest in the profits of an insurance agency unless he himself was a qualified insurance agent, which Mr. Smith was not. Mr. Price testified that Mr. Smith became dissatisfied with the arrangement and asked that it be converted to a loan, apparently because Mr. Smith determined that he would be more likely to get his money back that way. In any event, on January 28, 1988, Mr. Price executed a note in the amount of $10,000 in favor of Mr. Smith. On April 11, 1988, he executed a second note in the amount of $40,000 payable to Mr. Smith. Neither of these two notes was signed by Mrs. Price. At trial, however, Mr. Smith produced a carbon copy of a Promissory Note dated November 23, 1987 in the amount of $20,-000, executed by both Mr. and Mrs. Price. That note states that the loan of $20,000 is "to be paid by profits".

As indicated, the final payment of $10,-000 was made by Mr. Smith on or about June 28, 1988. In order to induce Mr. Smith to advance this last $10,000 payment, Mr. Price gave him four post-dated checks, in the amount of $5,000 each. The earliest date on such checks was October 1, 1988. On September 14, 1988, bank records show that the Health Insurance Benefits account, on which the post-dated checks were drawn, had a balance of $5,427.18. The following day, Mrs. Price caused to be opened a new account at Tri–County Bank in the name of "Price Enterprises, Tracy or Jill Price". Mrs. Price is the only person authorized to sign checks on such account. That same day, Mrs. Price caused $5,000 to be transferred out of the Health Insurance Benefits account into the new Price Enterprises account. Thereafter, all funds received by the insurance agency were deposited into the new account. Mr. Price admitted that the sole reason the new account was opened was to prevent Mr. Smith's four post-dated checks from clearing the bank. And Mrs. Price, in her later testimony, gave no other reason why she diverted such funds to the new account.

Thereafter, Mr. Price agreed that he would begin paying off the indebtedness to

Mr. Smith at the rate of $3,000 per month. In November 1988, Mr. Smith was paid $1,000, and was told that he was lucky to get it. That $1,000 represents the only payment Mr. Smith ever received on the obligation. He thereafter hired a lawyer to take action to collect the debt. Subsequently, Mr. Price came to Mr. Smith's residence in Kansas City, and told him that he had a plan to get Mr. Smith his money back. He began by telling him that instead of owing Mr. Smith, he, Mr. Price would rather owe the $50,000 to insurance companies. He suggested that Mr. Smith purchase a life insurance policy, which Mr. Price would sell him, and pay a $20,000 premium on such policy. The premium would be forwarded on to an insurance company, which would pay to Mr. Price his commission, which would represent approximately $10,000. Mr. Price would in turn pay that $10,000 over to Mr. Smith. Then, Mr. Price explained, Mr. Smith could cancel the insurance policy which had been purchased. If Mr. Smith did so within 30 days after the policy was issued, he would be entitled to a full refund of his $20,000, and Mr. Price would then owe to the insurance company the $10,000 commission he had received from it. According to Mr. Price, this same scheme could be used with other insurance companies to in effect transfer the loss from Mr. Smith to the insurance companies. Upon hearing this proposal, Mr. Smith stated that it sounded "crooked". Mr. Price stated that although he was "not supposed to do it that way", he would rather owe the insurance companies than Mr. Smith.

## III. ISSUES AND CONCLUSIONS

The burden of proof for the dischargeability of specific debts is placed upon the objecting creditor. Federal Bankruptcy Rule 4005. This burden is satisfied under the preponderance of the evidence standard. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because direct proof of intent is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir. 1987). The Court concludes that Mr. Smith has met his burden on alternative grounds pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

### A. *11 U.S.C. § 523(a)(2)(A)*

■ Pursuant to Section 523(a)(2)(A), a debt is nondischargeable if obtained by false pretenses, false representation, or actual fraud. The elements necessary to prove nondischargeability of a debt under Section 523(a)(2)(A) are:

1) debtor made false representations;

2) that at the time made, debtor knew them to be false;

3) that the representations were made with the intention and purpose of deceiving the creditor;

4) the creditor reasonably relied upon the representations; and

5) the creditor sustained the alleged injury as a proximate result of the representations having been made.

*Van Horne,* 823 F.2d at 1287. A debtor's silence regarding material facts may constitute false representations under Section 523(a)(2)(A). *Van Horne,* 823 F.2d at 1288.

■ In the present matter, it is undisputed that Mr. Price owes Mr. Smith a debt in the principal amount of $49,000.00.[1] The Court concludes that Mr. Smith has met his burden of proof under Section 523(a)(2)(A) with respect to the dischargeability of this debt. Substantial omissions were made in the course of this relationship, the most glaring of which was the failure to disclose the true nature of the receivables as contingent commissions rather than accounts receivable. A borrower has the duty to divulge *all* material facts to a lender. (emphasis added). *Van Horne,* 823 F.2d at 1288. In the present matter, Mr. Smith testified that material facts regarding the loan were not disclosed to him. Mr. Price could not rebut this testimony, but could

---

1. No evidence was presented regarding accrual    of interest on Mr. Smith's principal debt.

only assert, without any support, that he must have told Mr. Smith.[2]

In addition to this omission, the reports submitted to Mr. Smith only showed steady or increasing "accounts receivable." These reports, however, omitted the lack of collection of the so-called accounts, and contained discrepancies regarding the commissions actually owing to Mr. Price. These additional omissions occurred during the time that debtors were making additional requests for funds from Mr. Smith.

■ A creditor has the right to know those facts touching upon the essence of the transaction. *Van Horne*, 823 F.2d at 1288. When the creditor introduces evidence proving debtor's intent, the debtor cannot overcome that inference with an unsupported assertion of honest intent. *Van Horne*, 823 F.2d at 1287. The Court concludes that Mr. Smith was never told about the true nature of or the risks inherent in Mr. Smith's business, and that such omissions were a knowing deception on Mr. Smith's part. The Court further concludes that the omissions were made with the intent of deceiving Mr. Smith, who relied upon the representations that were made to him in initially and subsequently advancing funds to the Prices.

Additional misrepresentations and omissions were made to Mr. Smith in the circumstances surrounding the delivery of post-dated checks. Mr. Smith took receipt of the checks, and lent Mr. Price additional funds, based upon the representation that the checks could be cashed and funds drawn out of the "Health Insurance Benefits" account in the future. As that date drew near, however, this account was effectively closed, and all subsequent funds were deposited to the "Price Enterprises" account, for the sole purpose of preventing Mr. Smith from satisfying his debts. In summary, Mr. Price has satisfied the preponderance of the evidence standard with respect to all of the *Van Horne* elements under Section 523(a)(2)(A).

The present case is factually similar to the *Van Horne* case. There, debtor failed to disclose his intent to divorce his creditor's daughter at the time that terms on existing credit were extended. Five days after receiving fresh credit from his wife's family, he filed for divorce. The Eighth Circuit held that the debtor's actions constituted circumstantial evidence of his intent to deceive this creditor by failing to disclose material facts. In the present matter, Mr. Price's failure to disclose the nature of his business is analogous to that which was not disclosed in *Van Horne*. Furthermore, Mr. Price expressed his intent to deceive Mr. Smith by stating that the sole reason the bank accounts were changed was to prevent Mr. Smith from cashing the post-dated checks. Accordingly, Mr. Price's debt to Mr. Smith, in the principal amount of $49,000.00, is nondischargeable pursuant to Section 523(a)(2)(A).

### B. *11 U.S.C. § 523(a)(6)*

■ Pursuant to Section 523(a)(6), a debt is nondischargeable if it is for willful and malicious injury. The elements necessary to prove nondischargeability under this section are: 1) willful actions with 2) the intention or full expectation of harm to the economic interests of the creditor. *In re Phillips*, 882 F.2d 302, 305 (8th Cir. 1989), citing *In re Long*, 774 F.2d 875, 882 (8th Cir.1985).

In the present matter, there are two alternative grounds by which Mrs. Price is obligated to Mr. Smith. As discussed in detail below, the Court concludes that Mrs. Price is liable to Mr. Smith for conversion regarding the $20,000 in post-dated checks and the closed Health Benefits Insurance checking account. In addition, at some point in this transaction, Mrs. Price evidenced her intent to be obligated to Mr. Smith, for at least a portion of the borrowed funds, by signing the Promissory Note in the amount of $20,000.00. For these reasons, the Court concludes that Mrs. Price owes a debt to Mr. Smith in the

---

**2.** Mr. Price was much less credible as a witness than Mr. Smith. Indeed, Mr. Price's proposed solution to the unpaid debt was to engage in a pattern of fraudulent insurance practices in order to shift his obligations from Mr. Smith to third-party insurance companies.

amount of $20,000.00, and that such debt is nondischargeable under Section 523(a)(6).

The Court concludes that circumstances surrounding the changed checking account evidence conversion, and that it was the intent of both Mr. and Mrs. Price to willfully and maliciously injure Mr. Smith. Postdated checks were given to him. However, as the date on the checks approached, the original business account was depleted of funds, and a new account opened. Mrs. Price was the person who acted in draining the prior account of funds, opening a new account, signing the signature card, and depositing the funds into the account. Both Mr. and Mrs. Price knew that by effectively closing the original account and opening the "Price Enterprises" account, they were preventing the checks given to Mr. Smith from clearing the bank. And the evidence is uncontradicted that the sole reason for doing so was to prevent Mr. Smith's checks from clearing; thus, debtors clearly intended and expected Mr. Smith to suffer monetary harm as the result of their action. In *In re Marshall*, 24 B.R. 105 (Bankr.W.D.Mo.1982), the Court concluded that the depletion of a checking account when checks remained outstanding constitutes conversion under Missouri law.

> "There is little question but that debtor used the money in his account for his own use, thus depriving plaintiff of payment. Under Missouri law such conduct constitutes a conversion. 'Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's right.' ... Here, when debtor used the money in the account and depleted the balance so that the check to plaintiff could not be paid, he converted the money to his own use."

*Marshall*, 24 B.R. at 108. [citations omitted] In the matter at hand, the Court likewise concludes that conversion occurred when the funds in the Health Benefits Insurance account were withdrawn by Mrs. Price and deposited by her in the Price Enterprises account.

The present case is distinguishable from *Marshall*, however, on the issue of willful-ness and maliciousness. In *Marshall*, the Court concluded that the debtor's behavior only constituted reckless disregard, since he was not fully aware of the unpaid check. In the present case, the funds were depleted from the Health Benefits Insurance account for the sole reason of preventing Mr. Smith from drawing down the account proceeds. Mrs. Price caused this conversion. Mr. Price testified explicitly that such action was undertaken to prevent Mr. Smith's checks from clearing the bank. And Mrs. Price, who actively participated in the business operation, did not offer any other reason for her action in diverting funds from Mr. Smith. Accordingly, the Court concludes that there is sufficient evidence of intent and maliciousness as to both debtors to hold that the debt for conversion is nondischargeable under section 523(a)(6).

Accordingly, Mrs. Price's debt to Mr. Smith, in the principal amount of $20,000.00, is nondischargeable pursuant to Section 523(a)(6). As to Mr. Price, his entire $49,000 obligation to Mr. Smith is nondischargeable under Section 523(a)(2)(A), and $20,000 of such debt is alternatively nondischargeable pursuant to Section 523(a)(6).

The forgoing shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 7052.