In re Christopher Karl RIDSDALE former Vice President of Coldale Enterprise, Inc., Debtor.

Hi–Qual Roofing & Siding Materials, Inc., Plaintiff,

v.

Christopher Karl Ridsdale, a/k/a Chris Ridsdale, personally and as the former Vice President of Coldale Enterprises, Inc., Defendant.

In re Richard F. Collins, Debtor.

Hi–Qual Roofing & Siding Materials, Inc., Plaintiff,

v.

Richard F. Collins, personally and as the former president of Coldale Enterprises, Inc., aka Rick Collins, Defendant.

Bankruptcy Nos. 00–21154 N, 00–11547 K.
Adversary Nos. 00–1208 K, 00–2165 K.

United States Bankruptcy Court, W.D. New York.

Oct. 24, 2002.

Andrew J. Romanow, Harris Beach, LLP, Pittsford, NY, for Plaintiffs.

David D. MacKnight, Lacy, Katzen, Ryen & Mittleman, LLP, Rochester, NY, for Defendants.

### DECISION AFTER TRIAL

MICHAEL J. KAPLAN, Bankruptcy Judge.

### PROCEDURAL POSTURE

Defendant Richard F. Collins ("Collins") filed Chapter 7 on March 24, 2000 (Case No. 00–11547) and defendant Christopher Karl Ridsdale ("Ridsdale") filed Chapter 7 on April 26, 2000 (Case No. 00–21154). Plaintiff, Hi–Qual Roofing & Siding Materials, Inc. ("Hi–Qual") commenced a separate adversary proceeding in each case to determine whether the debt owed to Hi-Qual by the Defendants was dischargeable. By this Court's Order dated April 25, 2001, the two matters were set for joint trial and were heard on July 30, 2001 and continued from time to time. On March 22, 2002, counsel for the parties were given 30 days to submit post-trial memoranda, which were received on May 3, 2002, whereupon these matters were under submission.

### WITNESSES

In addition to testimony from the Debtors, the Court heard testimony from three witnesses.

Mark T. Fletcher ("Fletcher") came to work for *Coldale* in February 1996. Fletcher was initially involved in sales and advertising and then in late 1997 crafted a Business Plan in connection with an M & T loan application. Fletcher testified that he was promoted to a shareholder as security for the M & T loan. However, the Certificate of Incorporation shows Fletcher to have been an owner on the date of incorporation on February 16, 1996.

Greg DeLaus ("DeLaus") came to work for *Hi–Qual* in 1997. DeLaus was a Certified Public Accountant and started with Hi–Qual as Controller and was named an officer in May 1999. DeLaus was Vice President of Finance of Hi–Qual at the time of trial.

Deborah Fitzgerald ("Fitzgerald") worked as a bookkeeper for *Coldale* until August 1999. Fitzgerald's responsibilities included preparing reports for the accountant and general bookkeeping duties.

Fitzgerald was familiar with the check writing practices at Coldale and maintained "the books." Prior to Fitzgerald's employment with Coldale she worked for her father's roofing business (William C. McCombs Co.) until his death. Fitzgerald testified that Collins and Ridsdale had both worked for her father's roofing business.

Collins came to be viewed by Fletcher and Fitzgerald as dishonest and untrustworthy.[1] Fitzgerald testified that she saw Collins' dishonesty on a daily basis while he was working for McCombs, but that her father chose to look the other way because Collins was a good salesman. DeLaus also was aware that Collins' had a reputation for dishonesty. See footnotes 4 and 5.

## FINDINGS OF FACT

To begin, the Court sees no need to set forth findings as to the period of time before October 27, 1997. That is a period of time as to which relief was denied to the Plaintiff by prior, interlocutory, order of the Court. It is the Court's view that the Plaintiff "bought-into" the state of facts as they existed on that date. It was Hi-Qual's choice not to exercise due diligence before changing its position as trade creditor into a position as lender. That was addressed in the November 29, 2001 Decision. If the Plaintiff appeals a final judgment in this case and obtains a reversal on this point, and if necessary on remand, the Court then will render Findings of Fact as to the pre-October 27, 1997 period.

Similarly, the Court will not set forth findings as to all the things that the Plaintiff *did not* do to protect itself from injury by the Defendants. Although Defendants' counsel skillfully explored these matters on cross-examination of the Plaintiff's witnesses, this is not a "comparative negligence" case or an "assumption of the risk" case. This is a case of wilful and malicious injury; virtually by definition, one never "assumes the risk" of a wilful and malicious injury. Similarly, any notion of having "left oneself open" to such an injury is a non-sequitur, except, perhaps, where provocation or entrapment might be involved. But that would go to the question of whether there was "just cause or excuse" for injurious actions and nothing of the sort is implicated here.[2]

Rather, what Hi-Qual did and did not do here to protect its "investment" in becoming an "angel" for Coldale (as found below) is important for two purposes only: (1) To define the extent to which Hi-Qual anticipated good-faith performance of the agreement/compact/joint venture/or other "affiliation" (and, to this Court, the limits of such anticipation of good-faith were justifiable, reasonable, and sensible[3]); and (2) to describe the paper trail—the "radar pattern"—beneath which the Defendants successfully "flew" to exploit the resources of Coldale to their own benefit and to the detriment of the Coldale/Hi-Qual "affiliation."

These constitute the pertinent Findings of Fact under Rule 52 of the Federal Rules of Civil Procedure.

1. Coldale Enterprises, Inc. ("Coldale") filed a Certificate of Incorporation on February 16, 1996. The directors of the corporation were Richard F. Collins, Christo-

---

1. These terms are used in a highly generic sense in this Decision. No criminality is suggested. The terms are used in a moral or ethical sense which here rises to civil liability.

2. See the discussion below of the meaning of the phrase "wilful and malicious injury."

3. For example, DeLaus testified that a "joint signature" account would have stigmatized Coldale in the eyes of its customers.

pher Karl Ridsdale and Mark T. Fletcher. The owners were Christopher Karl Ridsdale and Mark T. Fletcher, each receiving 50 shares of stock. Collins and Ridsdale are the Debtors in these cases, and the Defendants in these Adversary Proceedings.

2. Coldale Enterprises, Inc. never filed for bankruptcy.

3. Coldale was in the roofing business. The plaintiff, Hi–Qual, was a major supplier of materials to Coldale.

4. At some point late in 1997 Coldale sought a SBA loan in the amount of $100,000 from M & T because Coldale was experiencing cash flow problems. M & T granted the loan only after Fletcher submitted his financials in place of Collins, as Collins had a previous personal bankruptcy. The only signatories on the account were Fletcher and Ridsdale.

5. A series of meetings between the principals of Hi–Qual and Coldale occurred in October 1997 as a result of Collins' request to borrow $10,000 from Hi–Qual to pay a vendor.

6. After review of cash flow projections and financial statements Mark Druen (president of Hi–Qual) decided to advance money to Coldale. Hi–Qual was owed approximately $150,000 at the time Hi–Qual decided to advance money to Coldale for payment to vendors. Cash advances of this nature were not a common practice of Hi–Qual.

7. Commencing on October 27, 1997, Hi–Qual representatives and one or both of the Debtors began meeting weekly. Coldale's revenue checks should have been turned over to Hi–Qual, and Hi–Qual examined Coldale's "payables" and, if necessary, funded payment thereof by loan advances made to Coldale. Hi–Qual also received payroll records, bank statements, vendor invoices, and bids.

8. Hi–Qual did not ask for or see cancelled checks. Hi–Qual relied on representations by Ridsdale and Fletcher that Collins was not an owner and could not sign checks or get cash out of the company.

9. The advances by Hi–Qual were conditioned on turnover of Coldale's revenues to Hi–Qual when Coldale got paid on the jobs they were performing.

10. Hi–Qual did not seek payment directly from Coldale customers or place liens on the jobs because Hi–Qual did not want to hurt Coldale's reputation. Hi–Qual's only hope of getting paid was through Coldale's ability to continue operations.

11. In July of 1998 Hi–Qual felt insecure and decided to turn the unsecured debt into a secured debt by way of a Promissory Note and Security Agreement. Hi–Qual was aware that it was undersecured, but one purpose was to begin receiving a fixed monthly payment from Coldale. Hi–Qual also obtained confessions of judgment from Coldale, and later from the Debtors as well.[4]

12. Hi–Qual was aware that M & T had first position on all the assets of Coldale.

4. Coldale executed a Promissory Note dated 7/27/98 and Hi–Qual obtained personal guarantees from Collins and Ridsdale. Fletcher refused to sign. The parties also executed a Security Agreement on 7/27/98 signed by Collins as President of Coldale. Hi–Qual filed the Financing Statement 11/24/98. Ridsdale and Collins signed confessions of judgment on June 29, 1999 and July 6, 1999 respectively.

(See Plaintiff's Exhibits 9, 10 and 11) DeLaus testified that he was aware, based on his inquiries and credit reports that Collins had a bad credit history because of a bankruptcy from a prior failed business and his reputation for honesty was not the best. DeLaus stated that he learned nothing negative with regard to the honesty of Fletcher or Ridsdale.

13. Hi–Qual made the decision in November or December of 1998 not to sell further to Coldale. However, Hi–Qual still felt they would get paid because Coldale had made regular payments in September, October and November of 1998. But after November the payments from Coldale stopped.

The following findings of fact are not in chronological sequence and may overlap other specific findings as to the time they occurred. They are collected here for convenience, to illustrate check-writing practices and improper conduct by the Defendants with regard to handling of Coldale's assets.

14. As to Coldale checks made out to Coldale itself or to Collins, Cash or Ridsdale, Collins or Ridsdale were supposed to provide receipts. Such checks were permitted only for Coldale-related trips, expenses, and casual labor.

15. However, Collins would take checks and not turn in receipts or otherwise account for their purpose. If the checks appeared to be for personal use or were undocumented they were to be posted as an officer's loan. But there were no repayments or repayment plan as to the officer's loan accounts for him or for Ridsdale.

16. Corporate funds were used for personal expenses included payments on a truck used by Collins' father, work on Collins' house, payments on Collins' mortgage and payments on Ridsdale's race car trailer.[5] (See Plaintiff's Exhibits 16, 27, 28 and 29 and Fletcher's testimony).

17. There is no dispute about the fact that any check written by Fletcher, even those to cash, was for legitimate expenses.

**18. There is no evidence that Ridsdale usually wrote checks for personal use, but he was aware of Collins' abuse, and it was "okay" with him. See footnote 5. The Court finds that Ridsdale shrewdly assuaged—de-fused—the concerns of Fletcher, Fitzgerald and De-Laus, to facilitate Collins' diversions of Coldale's assets and value.**

19. Fletcher did not attempt to stop Collins' questionable spending habits because (1) Collins was very knowledgeable, (2) Collins was responsible for sales, (3) Collins was key to the exclusivity of Polara roofing in the area, and (4) Ridsdale was a calming influence (for his and Collins' benefit).[6]

20. The Court finds that Collins used company funds to take his family on a Florida vacation. (Plaintiff's Exhibit 33).

21. The Court *finds* that funds from Coldale Enterprises were used to pay personal expenses of Collins and Ridsdale while they were working in Florida for what the Court *finds* was for their own benefit, not Coldale's. (See Plaintiff's Exhibit 34).

---

**5.** Fletcher stated that Collins "enjoyed privileges" with regard to use of corporate assets for personal use. Fletcher testified as to Ridsdale's "frustration" over Collins' conduct and Collins was aware of their frustration, but either disagreed or did not care. Fletcher alleged that there seemed to be something between the Defendants that made Collins' conduct "okay." DeLaus confirmed that Fletcher approached him in the Spring of 1998 and voiced concerns about non-business expenditures.

**6.** Hi–Qual too felt that the Polara exclusivity was key to any potential turnaround by Coldale. Collins, personally, obtained the Polara franchise when McCombs lost it. Collins testified that he sold it to Coldale and that Coldale paid over time in the form of credits against loans, etc. Coldale was to pay $20,000 to $30,000 for it. There was no evidence that Collins ever transferred Polara to Coldale. Polara is now sold by Mehrer Roofing, Collins' employer at the time of trial.

22. Collins signed checks drawn on M & T account despite the fact that he was not a signatory on the account.

The setting out of findings of fact in chronological order will now resume.

23. DeLaus was aware in the winter of 1998 that Collins and Ridsdale were going to Florida to look for work. Hi–Qual was assured by the Defendants that any earnings in Florida would be for the benefit of Coldale. Hi–Qual knew that Coldale had no license in Florida and that Collins and Ridsdale would have to work with other companies in Florida, but the Court *finds* that the formation of a new company in Florida by the Defendants was hidden from Hi–Qual by the Defendants.

24. Collins and Ridsdale continued to draw paychecks from Coldale Enterprises while working in Florida. Work continued in New York while Collins and Ridsdale alternated time in Florida over a 4 to 6 month period working first through Frank Casserino Construction (*hidden* from Hi–Qual) and then Florida Universal Roofing (also *hidden* from Hi–Qual).

25. A separate corporation, Coldale Group, was formed in Florida by Collins and Ridsdale. (Plaintiff's Exhibit 22 is an application for taxpayer identification number for Coldale Group dated 3/9/99).[7]

26. Equipment that went to Florida included a Taurus Tanker, dump truck, Kenworth tractor, Freuhoff dump trailer, wheelbarrows, safety lines, brooms, spudding machines, a crane and one other truck.[8].

27. Coldale Enterprises was never reimbursed by Frank Casserino Construction or Florida Universal Roofing for use of Coldale's equipment on the Florida jobs. The Court finds that Collins and Ridsdale personally got money from these affiliations.

28. DeLaus and Fletcher were unaware that a separate corporation was formed in Florida. Fitzgerald may have been aware that there was a separate corporation, but thought it to be "separate" from anything happening as to Coldale or Hi–Qual. See footnote 9.

29. The Court finds that an account was opened for the Florida company, Coldale *Group*, using funds from Coldale *Enterprises* despite Collins' testimony that Coldale *Enterprises never deposited money into the Florida account, and despite Ridsdale's testimony that he didn't "believe so."* (Plaintiff's Exhibit 21 is a check payable to Coldale Group from Coldale Enterprises drawn on the M & T account in the amount of $7000). Fletcher and Fitzgerald were unaware that the Florida

---

7. Collins testified that Coldale *Group* was formed in Florida to get name recognition. Ridsdale explained that they "performed through" Coldale *Group*, but there were no contracts by Coldale *Group*. Coldale *Enterprises* did business once in Tampa, without a license. Collins and Ridsdale explained that they worked "through" Frank Casserino. It was supposedly agreed that Frank Casserino would split profits (after expenses) for sales work performed by Collins, and labor performed by Ridsdale, on jobs. Collins and Ridsdale later "performed work through" Florida Universal Roofing until the date of Collins' fall on 8/27/99, but they were never

employees of Florida Universal Roofing. *Not a penny of Florida revenues ever found its way on to the books of Coldale or Hi–Qual.* See Finding # 30.

8. DeLaus indicated that although he had not thought about Coldale moving equipment to Florida at that time, "it would make sense" to move equipment to Florida, in hindsight. He did not, however, know that Coldale equipment was actually used by the Defendants to produce income for someone—be it Casserino, Universal, or the Defendants or their new company.

corporation was formed with funds from the M & T account.

30. No Florida revenues were ever paid in to Coldale Enterprises in any form. They were pocketed by the Defendants.[9]

31. Hi–Qual decided to seize Coldale's collateral in June 1999.

32. Hi–Qual coordinated to some extent with M & T to recover equipment and assets of Coldale. Defendants cooperated with Hi–Qual's seizure of office equipment which Hi–Qual later purchased from M & T.

33. Hi–Qual was unable to locate most of the equipment that was taken to Florida.[10] Hi–Qual did arrange to purchase a crane that M & T recovered from Florida.

34. Hi–Qual obtained and served a restraining order in September 1999 on accounts receivable, but discovered that most accounts had already been paid.

35. Hi–Qual went to Scottsville, N.Y. where a tanker truck was alleged to have been seen, but upon arrival the equipment had been moved.[11]

36. M & T's balance due from Coldale after realizing upon its collateral was between $16,000 and $18,000. Fletcher settled with M & T on his guarantee for $1000. M & T was reimbursed for 90% of the outstanding balance by the SBA.

37. It seems that any remaining debts of Coldale were minimal, thanks to Hi–Qual.

Further findings will be made below in discussing damages.

## DISCUSSION

This case is *sui generis*. It is *sui generis* because (1) it arises out of operation of a corporation that seems to have ended-up with no debt other than to the Plaintiff; (2) the corporation never landed in Bankruptcy Court; and (3) the case was pled and tried on a "fiduciary fraud" theory that this Court rejected, leading to an amended theory to which the then completely-presented case-in-chief did not directly speak.

An ordinary case presenting similar issues is that of trade suppliers delivering goods on credit to a company until the company is in bankruptcy. In such a case—the bankruptcy of the company—the fiduciary duty of principals to the creditors of the insolvent corporation is clear. See *In re Albion Disposal, Inc.*, 152 B.R. 794 (Bankr.W.D.N.Y.1993).

---

**9.** Fitzgerald testified that Florida was "something separate" and she was not privileged to know what was occurring in Florida. She thought that it had no bearing on Coldale.

As to Collins' testimony that "We never made any money in Florida," the Court finds that Collins ignores the obvious. The Defendants used Coldale equipment, Coldale money, Hi–Qual's loans, etc. and generated proceeds hidden from Coldale, from Hi–Qual, and (perhaps) from the IRS. No one cares whether Collins thinks he "made money." And he knows that that was not the question he was asked. (By a copy of this decision Collins will be referred to the Justice Department.)

**10.** Collins testified he last saw the equipment at Florida Universal Roofing's warehouse on 8/27/99 (the date on which Collins suffered a fall and period of disability). Collins said that he made no personal attempt to retrieve the equipment, but that he told Ridsdale about the equipment after his return to Rochester. Ridsdale informed DeLaus that a dump trailer was stolen in Florida, but there was no police report because it was not insured.

**11.** DeLaus testified that in the Spring of 2000, Hi–Qual was informed that the tanker truck was in Rochester being repainted to take the "Coldale" name off. Hi–Qual was informed they needed to bring the Sheriff, but when they arrived the next day the truck was gone. It was alleged that the tanker turned up in the possession of Collins' new employer.

But here the supplier/Plaintiff became a "controlling person" and a lender of operating cash. And now that the Defense has rested, the Court may explain its earlier ruling that the Plaintiff made a *prima facie* showing that both Defendants committed a "wilful and malicious injury" to the Plaintiff.

What is a "wilful and malicious injury?"

■ In *In re Stelluti*, 94 F.3d 84 (2nd Cir.1996) our Circuit stated that "the term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will. Implied malice may be demonstrated 'by acts and conduct of the debtor in the context of [the] surrounding circumstances.'" (internal citations omitted). See also, *In re Scheller*, 265 B.R. 39 (Bankr.S.D.N.Y. 2001), *In re Litwok*, 246 B.R. 1 (E.D.N.Y. 2000), *In re Schultz*, 239 B.R. 664 (E.D.N.Y.1999), *In re Luppino*, 221 B.R. 693 (Bankr.S.D.N.Y.1998), *In re Mitchell*, 227 B.R. 45 (Bankr.S.D.N.Y.1998).

■ The definition of the phrase "wilful and malicious injury" is well-settled. The Supreme Court in *Kawaauhau v. Geiger, (In re Geiger)* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) stated that "the word 'wilful' in (a)(6) modifies the word 'injury,' indicating that the nondischargeability takes a deliberate or intentional act that leads to injury."

The Supreme Court did not address the malice prong of § 523(a)(6) .... "Accordingly, reference must be made to Second Circuit case law which defines 'malice'." *In re Krautheimer*, 241 B.R. 330 (Bankr. S.D.N.Y.1999)

■ Clearly, after the point in time that the Plaintiff acquired a lien on the assets of Coldale, the intentional diversion of assets of Coldale to the personal benefit of the Defendants was an injury to "property" in which the Plaintiff had an interest.

But the Defendants' statement (at Point I of their brief) is in error in stating that "COMPLAINTS INVOKING 11 U.S.C. 523(a)(6) *ARE LIMITED* TO DEBTS FOR INJURIES TO PROPERTY IN WHICH THE CREDITOR HAS AN INTEREST." (Emphasis added) The statute is not so limited. Rather, the statute exempts from discharge any debts for wilful and malicious injury "to another entity *or*" to the property of another entity.

In business, as in life, a nearly limitless variety of allegiances are formed. We lawyers like to think that if we did not structure and document allegiances and alliances, breakdowns within those relationships are actionable. After-the-fact, we cannot figure how to shoehorn them into identifiable configurations. If that does not succeed, then may our clients engaged in a free-for-all? No holds barred?

■ We must rebuff our own reflexes—our own fixation on pigeonholing—and accept the fact that one may "wilfully and maliciously injure" someone else without a formal relationship; one may cheat another without involving the other's property; one may defraud without expressly lying; one may use "slight of hand" to harm; and the various ways in which one in business may open oneself up to sharp dealing is not consent to intentional harm.

The *practice* of law is a set of rules and ethics and forms and templates. But *the law itself* is made up of words that sometimes have an ordinary and clear meaning.

"Wilful and malicious" has such a meaning.

The wilful and malicious injury that the Court has found is not limited to any property or property interest of Hi–Qual (although clearly there was an injury to a property interest of Hi–Qual after it acquired the security interest on July 27,

1998) but rather to Hi–Qual itself. The Defendants' focus on "conversion" is unnecessary and misleading.

A wilful and malicious injury to "another entity" may be accomplished in an almost limitless variety of ways. For example, if I wish to put someone out of business [12] I might trespass, vandalize her equipment, interfere with her contracts, defame her, do bodily injury to her, etc., etc. These are all injuries to her or to her property, and they are all intentional torts.

But I also might use my economic power to starve his business of necessary materials or transportation. I might exercise political or other influence to see to it that he gets no jobs, or that he suffers labor unrest.

■ In fact, my means may be a combination of facts that individually might be lawful and might not injure any of his property,[13] or injure any of her property interests, but collectively are "wrongful," and thus nondischargeable. This is because the statute does not say "by unlawful means," does not say "by means of intentional tort," and does not require an injury to property.

■ Consequently, one finds such cases as *In re Mogul,* 36 B.R. 46 (Bankr.S.D.Fla. 1984). The debtors borrowed $57,000 secured by their yacht. They were required by the note, security agreement, and ship mortgage to insure the lienor's interest on the vessel and to furnish the bank with proof of such insurance. At first they did so. But they let the initial insurance policy lapse and secretly obtained a new policy from a different insurance company, and did not list the lender as loss-payee or as

lienor. (This was probably not illegal conduct.) Shortly thereafter the yacht sank, and the debtors secreted $200,000 in insurance proceeds. (Again, probably violating no criminal laws and possibly committing no intentional torts.) They continued to make payments for a couple of years but then defaulted, whereupon the lender found out, for the first time, about the loss of the vessel and the debtors' receipt of the insurance proceeds. The bankruptcy court found that the debtors' secret collection of the insurance proceeds coupled with (1) their intentional failure to maintain insurance on the yacht with the lender as loss-payee, and (2) their failure to advise the lender of their purchase of the replacement policy, constituted a "wilful and malicious injury" to the bank within the meaning of the statute. This case demonstrates that what might be merely a breach of a contract duty (to insure collateral for the benefit of the lienor) may become a "wilful and malicious injury" to another by means of one or more lawful actions, coupled with intent to deprive another of their rights, without just excuse, resulting in damage.

Similarly, in the case of *In re Hallahan,* 78 B.R. 547 (Bankr.C.D.Ill.1987) *aff'd.* 113 B.R. 975 (C.D.Ill.1990), *aff'd.* 936 F.2d 1496 (7th Cir.1991), it was found that a former employee of Ozark Insurance who intentionally and knowingly sold Connecticut Mutual Insurance policies to Ozark policyholders in violation of a covenant not to compete against Ozark, did so without any just cause or excuse. And he was found to have caused a wilful and malicious injury to Ozark. (The court in that case specifically refused to consider whether

---

**12.** Of course this is not a case about endeavoring to put someone out of business. This example is offered only as a starting point for discussion.

**13.** Consider *In re Reid,* 237 B.R. 577 (Bankr. W.D.N.Y.1999), wherein the "free speech" exercised by the debtor at an abortion clinic was "a wilful and malicious injury" because it was exercised in violation of an injunction.

the debtor's actions also constituted the tort of intentional interference with a business expectancy.)

That the above case involved what this Court will call a "special" kind of agreement—in that case a non-competition covenant—may be important.[14] So too did a special agreement figure in the case of *In re Fussell*, 15 B.R. 1016 (W.D.Va.1981). A corporate officer caused the corporation to repay him on a loan that he had extended to the corporation. Repayment was in violation of a *subrogation agreement* that he had executed in favor of another creditor. Though the obligation to him was subordinate, he caused the payments to himself. He caused the payments to be made while the corporation was suffering from a cash flow problem, and he caused the corporate account to have insufficient funds to cover the automatic withdrawal of payments to *the other* creditor. This scheme constituted a wilful and malicious injury.

In a similar vein, the debtor in the case of *In re Price*, 124 B.R. 791 (Bankr. W.D.Mo.1991) was found to have committed a wilful and malicious injury in intentionally moving bank deposits from one bank account to another bank account to another bank account to defeat a creditor's effort to collect upon post-dated checks given by the debtor. Again, it was a special kind of contract. The creditor in that case was in essence a co-owner of the debtor's business, but was disqualified from genuine ownership of the business because the business was an insurance business and the creditor was not himself a licensed insurance agent. Hence, the issuance and acceptance of a series of post-dated checks was utilized instead of an installment note. (It should be noted that the court in that case found a "conversion" when funds were moved out of the reach of the creditor; but to this writer, such characterization was entirely unnecessary.)

(The above cases were decided before the United States Supreme Court decided *In re Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), but that case merely made clear that the injury itself must have been wilful and malicious, if a debt arising therefrom is to be held non-dischargeable; i.e. a reckless act that results in an unintended injury is not non-dischargeable. Consequently, that case does not affect the holding of the cases discussed above in which the heart of the case (and at the heart of the case currently at bar) is an injury that was specifically intended by each defendant.)

The Court finds here that the Defendants, as of October 27, 1997, welcomed Hi–Qual as an active "angel," but an angel that they meaningfully kept in the dark. Perhaps a joint venture or duty of trust or new "firm" was created *de facto*. But assuming not, there clearly was created a special kind of relationship. It was clear to the Defendants that their use of Coldale assets for the benefit of themselves rather than Coldale would exploit Coldale's assets and Hi–Qual's assistance, for their own personal gain. They also knew that a diversion of revenues earned by use of Coldale's assets would injure Hi–Qual because Hi–Qual was paying Coldale's expenses, and Coldale's revenues that would have funded payments to Hi–Qual or to Coldale's creditors would reduce the need for new Hi–Qual loans to Coldale. Loans that went unpaid.

Collins and Ridsdale could have simply walked away from this relationship. They did not. Although they continued to operate Coldale in Western New York for certain appropriate purposes, the Court finds

---

**14.** How important that might be, if at all, will be left to another day.

that they manipulated and exploited Coldale's assets and Hi-Qual's reasonable expectations of good faith, for their personal benefit.

To recapitulate, until October 27, Coldale was a personal Piggy Bank for Collins and Ridsdale.[15] There is absolutely nothing wrong about that so long as Coldale was solvent (because it was not publicly-traded).

Once Hi-Qual presented itself to these Defendants, and was accepted by these Defendants as an "angel," Collins and Ridsdale did two things. 1. They drove substantial value "under the radar," and 2. They milked the existing system for their personal purposes.

It is important to be clear as to the joint and several liability of Ridsdale and Collins in light of the fact that they are not co-defendants. (Joint and several liability was not pled. Instead, these are separate dischargeability complaints in separate bankruptcy cases, consolidated for various purposes including trial and decision.)

The Court ruled at the close of the Plaintiff's case, that a *prima facie* case of wilful and malicious injury had been proven as against *each* Defendant, but without a finding as to the extent of liability as to each. Then the Court invited the Defendants to reopen discovery as against each other only, and to sever and proceed to defend not only against Hi-Qual, but against each other. They declined that invitation and rested without presenting any evidence in defense against Hi-Qual or against each other.

The posture of these cases is such as to permit the entry of judgment in favor of Hi-Qual for the full amount of its allowable damages against each Defendant, lim-

ited, of course, to a single recovery. (It would be entirely possible and permissible for the two Defendants to reach or have reached some form of agreement between themselves as to how to allocate any liability to Hi-Qual that this Court might declare.)

There having been no evidence presented by Collins against Ridsdale or Ridsdale against Collins, only one finding need be explained—(it was "made" when the Court made its November 29, 2001 ruling—in order to make clear the fact that today's holding is the equivalent of a holding of "joint and several liability.")

That finding is that Ridsdale is as liable as Collins. He was as shrewd as Collins was brazen. See Findings 18 and 19. Ridsdale was the "grease" that let Collins move. Had Ridsdale risen up against him, the damage to Hi-Qual never would have occurred. But it is not "inaction" that the Court finds, it is complicity.

## DAMAGES

Damages are not as clear as the Plaintiff suggests, even though the Court agrees with the Plaintiff that the inability to place a value on certain assets ought not to work in favor of the Debtors, who diverted the assets or revenues to be valued.

Diversion of assets and revenues of Coldale does not necessarily mean diversion from Hi-Qual on a dollar for dollar basis. Rather, diversions from Coldale led Hi-Qual into further extensions of credit by Hi-Qual. Beyond that, Hi-Qual was not entitled to a treatment that is superior to other creditors of Coldale. But Coldale never filed bankruptcy. Consequently, we do not know its financial condition, at rele-

---

**15.** There were numerous exhibits demonstrating personal use of Coldale funds *prior* to

October 27, 1997.

vant times, nor do we know the priority of lien rights other than as to M & T.

But it appears to be the case that the only unsatisfied creditor of Coldale is Hi-Qual.

■ We must exclude from damages whatever losses are attributable to the passive indifference of Defendants—such as the particular equipment in Western, N.Y. that cannot be found. Only a duty of trust would require an accounting as to equipment seemingly being used in pursuit of Coldale's interests. The possibility that some assets here were not so used was not evidenced, and no trust relationship is established.

■ The equipment taken to Florida, on the other hand, was never used to generate revenue for Coldale—only for the Defendants themselves. The equipment was never returned nor was the value of that equipment ever accounted for by Defendants, to Hi-Qual or to the Court. This was, the Court finds, equipment and revenue embezzled from Coldale to divert value from Coldale's creditors, including Hi-Qual.

We must exclude from damages the losses that are attributable to Hi-Qual's realization that it was subordinate to the bank. Junior lienors are often very aggressive in helping the senior lienor in hopes that there is some value left. The Court cannot charge these Defendants to the extent of Plaintiff's admitted deference to M & T; this is because the Court has ruled that no fiduciary relationship taking steps between Defendants and Plaintiff once Plaintiff "burst" that relationship by taking steps to

effectively control Coldale, extending more credit to it.

■ Because the *fact* of damage is not speculative here,[16] but rather it is the *amount* of damage that is speculative [17] (in part), the Court is not limited to an award of nominal damages.[18] The standard is this: "The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." The requirement of certainty does not prevent the drawing of reasonable inferences from the facts and circumstances in evidence and where a tort is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it is enough if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result is only proximate.[19]

## FINDINGS AS TO DAMAGES

38. The Court finds that the rolling stock taken to Florida, for which Defendants are liable are the 1974 Dump ($6000); another truck ($18,160), and Freuhoff Trailer ($10,000) (Defendant's C).

39. The Court finds the revenues lost to Coldale in Florida are too speculative to be awarded as damages to Hi-Qual.

40. The Court finds that of $54,652.24 in value of other equipment ( Plaintiff's 8 and Defendant's C), $20,000 went to Florida and was never recovered.

41. The Court finds that the following checks signed by Collins (who had no check writing authority) after 10/27/97 were diverted to personal use. Check

**16.** 22 Am.Jur.2d, *Damages* § 488 [case citations omitted] (1988).

**17.** 22 Am.Jur.2d, *Damages* § 489 [case citations omitted] (1988).

**18.** 22 Am.Jur.2d, *Damages* §§ 486–487 [case citations omitted] (1988).

**19.** 22 Am.Jur.2d, *Damages* § 488 [case citations omitted] (1988).

**238**

2855 ($1580.93 payable to Collins); 2960 ($922.90 to Collins), (Plaintiff's 19 and 20).

42. The Court finds that the following checks signed by Ridsdale were diversions: 2766 ($1000 to Collins); 1897 ($4500 to Collins for Florida); 155 ($1000 to Collins) (Plaintiff's 19).

43. The Court finds that the following checks for the Florida enterprise were diversions: 2896 ($7000 to Coldale Group) (Plaintiff's 21); 2927 ($44.37 to Florida Power); 3017 ($97.68 to Florida Power); 2006 ($3500 to "cash" for "Tampa") (Plaintiff's 23 and 24).

44. The Court finds that check 2739, which bears no signature, was a diversion ($922.20 to Collins (the same amount as check 2960 which was signed by Collins)) (Plaintiff's 20).

45. The Court finds that the value of the Polara franchise was diverted. Collins himself valued it at $20,000–$30,000. The Court accepts the $30,000 valuation.

The Court strongly suspects that many other checks made payable to "cash" or to "Coldale" and signed by Ridsdale were improper diversions, but finds inadequate evidence to award them as damages. The total of damages is, thus, $104.728.08.

By separate decision, this Court will award a money judgment in this amount, against each Debtor, jointly and severally. By the present decision, said amount is declared "Not discharged" as to either Debtor.

SO ORDERED.